**06-4536-cv**
**Eberhard v. Marcu**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————

August Term, 2007

(Argued: April 10, 2008                                    Decided: June 20, 2008)

Docket No. 06-4536-cv

———————

SANDI EBERHARD,

*Intervenor-Appellant*,

- v. -

AARON R. MARCU, Receiver for the Assets of Todd M. Eberhard,

*Receiver-Appellee.*

———————

Before:

CABRANES, SOTOMAYOR, and WESLEY, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York (Berman, *J.*) which, following a bench trial, set aside a purported transfer as a fraudulent conveyance under N.Y. Debtor & Creditor Law § 276 and denied Appellant's claims for a preference among creditors and a constructive trust. We hold that the Receiver-Appellee lacked standing to bring the fraudulent conveyance claim and that the district court's denial of Appellant's application for a jury trial violated the Seventh Amendment because the suit is one at law. Accordingly, the judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

———————

VIVIAN SHEVITZ, (Jane Simkin Smith, of counsel, *on the brief*), South Salem, NY, *for Appellant*.

ANDREW A. RUFFINO, (Alan Vinegrad, Douglas B. Bloom, *on the brief*), Covington & Burling LLP, New York, NY, *for Appellee*.

———————

WESLEY, *Circuit Judge*:

This appeal presents novel issues concerning the authority of a federal securities receiver over property claimed by a third party. We hold that a receiver cannot employ section 276 of New York's Debtor & Creditor Law to set aside a fraudulent conveyance where he represents only the transferor. We also hold that a third party is entitled to a jury trial under the Seventh Amendment to determine ownership of property claimed by a receiver. For these reasons, we vacate the judgment of the United States District Court for the Southern District of New York (Berman, *J.*) and remand for further proceedings consistent with this opinion.

## BACKGROUND

Between 1998 and 2003, Todd M. Eberhard perpetrated a wide-ranging securities fraud, using his broker-dealer firm Park South Securities, LLC ("Park South") and his investment advisory firm Eberhard Investment Associates, Inc. ("EIA") to loot customer funds, issue phony account statements and "churn" customer accounts to increase his commissions. On February 4, 2003, Eberhard was charged with, *inter alia*, conspiracy, investment advisory fraud, mail and wire fraud, and obstruction of justice, ultimately pleading guilty to eleven counts and receiving a

prison term of 160 months.[1]

The SEC commenced a parallel civil enforcement action in the district court. On February 5, 2003, Judge Berman issued a temporary restraining order freezing the assets of Eberhard, EIA, and Park South and appointing Aaron R. Marcu receiver for EIA and Park South. Five days later, the court removed Park South from the Receivership, appointed Irving H. Picard as its Securities Investor Protection Act ("SIPA") trustee to pursue the claims of defrauded investors, and removed Park South's liquidation to the bankruptcy court. After several months, the court changed the Receivership again, adding Eberhard's personal assets. In September 2003, the Receivership was altered a third time – EIA was removed and substantially consolidated with Park South in the bankruptcy court. *See In re Park S. Sec., LLC*, No. 03-8024A (Bankr. S.D.N.Y. Sept. 10, 2003). As a result of that order, all that remained in the Marcu Receivership were the personal assets of Todd Eberhard.

This case is a dispute over the ownership of one of those assets – a Nova Scotia corporation named Borderline Development NS, Inc. ("Borderline NS"), formed in April 2000 with Todd Eberhard as sole shareholder. In three separate transactions in 2000 and 2001, Eberhard caused the corporation to purchase two apartment buildings in Montreal and an uninhabited island off the coast of Nova Scotia (collectively, the "Canadian Properties"). These purchases were funded by loans, extended by a bank in Georgia, that were paid back with earnings in EIA checking accounts.

---

[1] We recently affirmed this sentence on appeal. *See United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008).

In conjunction with the SEC enforcement action, Todd Eberhard provided an affidavit detailing all of his personal assets. In the affidavit, Eberhard represented that he was the "sole owner" of Borderline NS, but later notified the court that he had erred in listing the corporation as his own. He indicated that prior to his arrest, he had transferred it to Appellant, his mother Sandi. In an effort to convince the SEC and the district court, he submitted a document that purported to demonstrate the conveyance. Entitled "Re: Transfer of Ownership of Borderline Development Corporation N.S.," and signed by both Todd and Sandi Eberhard, the document indicated that, on June 21, 2000, Todd Eberhard transferred 90% of the ownership of the corporation to Sandi in exchange for her assumption of a $500,000 line of credit issued jointly to Todd and Sandi Eberhard by Citibank in 1994. Sandi thereafter intervened in the civil action under Rule 24 of the Federal Rules of Civil Procedure. She later admitted that the document Todd had submitted was a fraud, explaining that she and her son could not locate the "real documents" that allegedly reflected a conveyance of the corporation not in June 2000, but in June 2002.

On April 18, 2003, the district court entered an order authorizing the Receiver to "take all steps [he] deems appropriate for the collection, preservation, maintenance and operation" of the frozen assets, including Borderline NS, in order to "protect th[e] Court's ability to award equitable relief in the form of disgorgement of illegal profits from fraud and civil penalties." With regard to the disputed ownership of Borderline NS, the order provided that:

> The Receiver shall take whatever investigative steps he deems appropriate to
> ascertain ownership or other interests in these assets and, if necessary, bring
> appropriate proceedings in this Court to determine such interests or grant other

relief. Until ownership . . . is determined, either by agreement between the Receiver and Eberhard or by the Court, they shall be regarded as Eberhard's assets for purposes of the asset freeze.

More than two years later, on September 9, 2005, the Receiver reported to the court that Borderline NS was an asset of Todd Eberhard because the conveyance to his mother did not occur, and even if it had, it should be set aside as fraudulent. As a result, he sought the court's authorization to sell the Canadian Properties. Sandi opposed the application, maintaining that her son conveyed the corporation to her in 2002 as noted above. She also argued that she was entitled to a jury trial to determine ownership, that the Receiver lacked standing to set aside the transfer and that the court did not have subject matter jurisdiction over his claim.

On January 31, 2006, Judge Berman issued an order rejecting Appellant's procedural objections. *See SEC v. Eberhard*, No. 03 Civ. 813 (S.D.N.Y. Feb. 1, 2006). The court concluded that the Receiver had standing "'to recover fraudulently obtained funds that [have] come to rest with' a third party, even a 'non-wrongdoing party.'" *Id.* (quoting *SEC v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005) (alterations in original)). The court also held that its jurisdiction to fashion appropriate relief enabled it to decide between competing claims of ownership. *Id.* Finally, the court concluded that the procedures afforded to Sandi in a bench trial would comply with due process, because she had voluntarily intervened and would be given the opportunity to present witnesses and evidence. *Id.*

With these procedural rules in place, the court conducted a bench trial on June 1, 2006 to determine ownership of Borderline NS. The Receiver conceded that a farm owned by Sandi was used as collateral for the Citibank loan (the supposed consideration for the transfer), but noted

that she began making principal and interest payments only after her son's arrest in 2003, not when she allegedly assumed responsibility for the loan in June 2002. Sandi took no part in Borderline NS's management and failed to disclose her purported ownership interest in the corporation on her 2002 tax returns. Sandi did produce the missing "real documents" demonstrating the transfer, and Jack Dacosta, the manager of the Canadian Properties, testified that he prepared those documents in June 2002 and had possessed them since that time.

The court found that the Canadian Properties were purchased solely by Todd Eberhard, using funds derived from his criminal activities. *See SEC v. Eberhard*, No. 03 Civ. 813 (S.D.N.Y. Aug. 11, 2006). Sidestepping the question of whether the contested conveyance actually took place, the court held that it should be set aside under N.Y. Debtor & Creditor Law § 276 as a fraudulent conveyance. *Id.* The court noted that the transaction bore several "badges of fraud" including lack of adequate consideration, intra-family transfer, Sandi's lack of managerial involvement with the company, and an intent to hinder or defraud Todd's creditors inferred from the earlier backdating scheme. *Id.* The court also rejected Sandi's requests that the transfer be upheld as security for her real estate investments with Todd and that a constructive trust be imposed in her favor. *Id.* The court entered judgment against Appellant on September 27, 2006, concluding that "Sandi Eberhard, intervenor in this action, has no ownership or other interest with respect to [Borderline NS] or its common stock."

Sandi Eberhard appeals, arguing that: (1) the Receiver lacked standing to set aside a fraudulent conveyance under N.Y. Debtor & Creditor Law § 276 and the district court was without jurisdiction over that claim; (2) she was entitled to a jury trial under the Seventh

Amendment; (3) the transfer of Borderline NS was not a fraudulent conveyance but a legitimate preference among creditors; and (4) she was entitled to a constructive trust on the real property that her son purchased with the money in EIA accounts traceable to her.

**DISCUSSION**

1.      Subject Matter Jurisdiction

Appellant simultaneously questions the Receiver's standing and the district court's subject matter jurisdiction over the Receiver's fraudulent conveyance claim, contending that the district court does not have jurisdiction over a claim that the Receiver lacks standing to assert.[2] This argument confuses two entirely separate issues. The Receiver may pursue in the district court all possible grounds for relief related to the ownership of Borderline NS. However, the district court's determination of the merits of each claim (and the Receiver's standing to assert it) is separate and distinct from the court's power to hear it. "So long as an action commenced by a court appointed receiver seeks to accomplish the ends sought and directed by the suit in which the appointment was made, such action or suit is regarded as ancillary so far as the jurisdiction of the court of the United States is concerned." *Tcherepnin v. Franz*, 485 F.2d 1251, 1255-56 (7th Cir. 1973) (internal quotation marks and alterations omitted); *see also Chicago Title & Trust Co. v. Fox Theatres Corp.*, 69 F.2d 60, 61 (2d Cir. 1934) (stating that a court that appoints a receiver has "jurisdiction to decide all questions of the preservation, collection and distribution of [the] assets" of the entity in receivership).

---

[2] This Court reviews district court decisions of subject matter jurisdiction de novo. *See DiTolla v. Doral Dental IPA of N.Y., LLC*, 469 F.3d 271, 275 (2d Cir. 2006).

The district court ordered the Receiver to investigate Appellant's claim of ownership of Borderline NS, an asset initially identified by Todd Eberhard as his own and an asset under the district court's jurisdiction as a result of the asset freeze. The current litigation arose from that investigation. Even where we have not approved of a receiver's actions, we have upheld the court's jurisdiction if "the receiver's suit is to aid in the accomplishment of the ends sought and directed in the SEC action." *Esbitt v. Dutch-Am. Mercantile Corp.*, 335 F.2d 141, 142-43 (2d Cir. 1964) (questioning the use of a receivership to perform the functions of a bankruptcy court). We have little difficulty holding that the district court had jurisdiction over the matter of the Receiver's application.

2.      The Receiver's Fraudulent Conveyance Claim

In support of his application to the district court, the Receiver presented two alternative theories: that the June 2002 conveyance of Borderline NS to Appellant never occurred, and that, even if it did, it should be set aside as fraudulent under N.Y. Debtor & Creditor Law § 276. The district court accepted the latter. Sandi contends that the Receiver cannot utilize the statute as he does not represent a creditor of Todd Eberhard.[3] We agree.

A.      *N.Y. Debtor & Creditor Law § 276*

It is well settled that in order to set aside a fraudulent conveyance, one must be a creditor of the transferor; those who are not injured by the transfer lack standing to challenge it. N.Y.

_____

[3] The Receiver's standing under N.Y. Debtor & Creditor Law § 276 involves the interpretation of a state statute, a question of law that we review de novo. *See KLC, Inc. v. Trayner*, 426 F.3d 172, 174 (2d Cir. 2005).

Debtor & Creditor Law § 276 makes this requirement explicit: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent *as to both present and future creditors*." N.Y. Debt. & Cred. Law § 276 (emphasis added). The conveyance is not void per se, but voidable by creditors of the transferor.

This proposition is hardly novel – section 276 is a direct descendant of the Statute of Elizabeth, enacted by Parliament in 1570.[4] *See Hearn 45 St. Corp. v. Jano*, 283 N.Y. 139, 142 (1940). The Statute of Elizabeth was passed "to aid the creditor in his pursuit of legal assets." Garrard Glenn, The Law of Fraudulent Conveyances § 5, at 8 (1996). Thus, only those who "are, shall or might be in anywise disturbed, hindered, delayed or defrauded" by the fraudulent conveyance were permitted to set it aside. *Id.* app. at 588 (quoting Statute of Fraudulent Conveyances, 1570, 13 Eliz., c. 5, § 2 (Eng.)). In contrast, non-creditors were not "enabled by the statute of 13 Eliz. c. 5 . . . for the statute makes the deed void as against the creditors, but not against the party himself, his executor or administrators; for against them it remains a good deed." *Hawes v. Leader*, (1608) 79 Eng. Rep. 232, 233 (K.B.).

---

[4] The precise date of the statute's enactment seems to be a matter of debate, even among some of our most learned judges. Some say 1570, *see, e.g.*, *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540 (1994) (Scalia, *J.*); *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 162 n.3 (1974) (Douglas, *J.*, dissenting); *In re Duplan Corp.*, 591 F.2d 139, 141 n.2 (2d Cir. 1978) (Friendly, *J.*), while others say 1571, *see, e.g.*, *Merrill v. Nat'l Bank of Jacksonville*, 173 U.S. 131, 173 (1899) (Gray, *J.*, dissenting); *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988) (Easterbrook, *J.*); *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1506 (1st Cir. 1987) (Breyer, *J.*). If it mattered, we would cast our lot with our venerable colleague Judge Friendly, but suffice it to say that regardless of its exact age, the statute is said to have generally codified the common law as it existed at the time of its enactment. *See In re Mankin*, 823 F.2d 1296, 1301 n.2 (9th Cir. 1987).

In 1829, New York enacted its own fraudulent conveyance law based on the principles embodied in the Statute of Elizabeth.[5] *See Republic of Italy v. De Angelis*, 206 F.2d 121, 127 (2d Cir. 1953) (Clark, *J.*, concurring). The statute retained the creditor standing requirement, providing that a fraudulent conveyance is void only "as against the persons . . . hindered, delayed or defrauded." 2 N.Y. Rev. Stat. 137 § 1 (1829). Early New York decisions made clear that "[e]very sale or other transfer of goods made with intent to defraud creditors, though valid as between the parties to the transaction, is utterly void as to creditors." *Babcock v. Booth*, 2 Hill 181, 183 (N.Y. Sup. Ct. 1842). Thus, grantors remained bound by their own fraudulent conveyances. *See Ford v. Harrington*, 16 N.Y. 285 (1857). As future United States Supreme Court Justice Samuel Nelson stated, the creditor standing requirement was "the received construction" of the Statute of Elizabeth since at least the early Seventeenth Century. *Nellis v. Clark*, 20 Wend. 24, 39 (N.Y. Sup. Ct. 1838) (Nelson, *C.J.*, dissenting). Such was the state of the law in New York into the 1900s.

In 1925, the Legislature enacted the Uniform Fraudulent Conveyance Act, N.Y. Debtor & Creditor Law §§ 270-281, "a codification of previous statutes . . . which had their origin in the statute of 13 Eliz. ch. 5." *Hearn 45 St. Corp.*, 283 N.Y. at 142. In drafting the Act, the National Conference of Commissioners on Uniform State Laws sought to eliminate the confusion caused by attempts to stretch the Statute of Elizabeth (and its state law progeny) to "cover all conveyances which wrong creditors," including those made without an actual intent to defraud.

[5] The 1829 enactment replaced a 1787 statute that largely mirrored the language of the Statute of Elizabeth. *See* 1 Greenleaf's Laws of the State of New York, Tenth Session, ch. XLIV, § 2, at 382 (1787).

Prefatory Note, Uniform Fraudulent Conveyance Act (1918); *see Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 127-28 (2d Dep't 1986). However, because its express terms confine it to conveyances made with actual fraudulent intent, section 7 of the Act, codified at N.Y. Debtor & Creditor Law § 276, "is practically identical with the 13th of Elizabeth." *Lee v. State Bank & Trust Co.*, 54 F.2d 518, 520 (2d Cir. 1931).

In keeping with centuries of common law and statutory tradition, state and federal courts construing section 276 have continued to allow only creditors to set aside fraudulent transactions. Non-creditors can find no relief in a statute whose "object . . . is to enable a creditor to obtain his due despite efforts on the part of a debtor to elude payment." *Hearn 45 St. Corp.*, 283 N.Y. at 142. "[E]ven if a transfer is made with actual intent to defraud creditors, one must be a creditor in order to complain."[6] *Martes v. Uslife Corp.*, 927 F. Supp. 146, 148 (S.D.N.Y. 1996); *see also Lazar v. Libby*, 28 Misc. 2d 131, 132 (N.Y. Sup. Ct. Nassau County 1960) (plaintiff whose debt was paid no longer had "the status of a creditor [and] [t]o maintain an action under section 276 of the Debtor and Creditor Law . . . , the plaintiff must have such status").

Fraudulent conveyances are binding on all non-creditors, including the transferor himself. As the Court of Appeals has noted, "[t]he general rule, that courts will . . . extend no remedy to a grantor or vendor of property to recover back from the grantee or vendee the property thus transferred . . . is too well settled to be now called in question." *Pattison v. Pattison*, 301 N.Y. 65, 73 (1950).

---

[6] Under N.Y. Debtor & Creditor Law § 270, "creditor" is defined as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."

History and the plain language of the ancient statute's offspring leave no doubt that a transferor cannot set aside a disposition of assets on the ground that the disposition allegedly constituted a fraudulent transfer. This is so for good reason. Were transferors allowed to assert fraudulent conveyance claims against those to whom they transfer property, transferors would be empowered to rescind transactions by virtue of their own fraudulent or deceptive designs. Such empowerment would be perverse. Accordingly, Todd Eberhard could not rely on his fraudulent intent to rescind a transfer of property to his mother, but a creditor of Todd Eberhard could. The question then becomes whether the Receiver represented a creditor of Todd Eberhard, or merely Todd Eberhard himself.

B. *The Role of Federal Securities Receivers*

District courts possess broad power to remedy violations of federal securities laws. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972). Thus, "[a]lthough neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 explicitly vests district courts with the power to appoint trustees or receivers, courts have consistently held that such power exists." *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987).

Receivers appointed at the SEC's request are equipped with a variety of tools "to help preserve the status quo while the various transactions [are] unraveled . . . to obtain an accurate picture of what transpired." *Manor Nursing Ctrs.*, 458 F.2d at 1105. We have observed that "[a] primary purpose of appointing a receiver is to conserve the existing estate." *Esbitt*, 335 F.2d at 143. Receivers are directed to "marshal the assets" of the defendant, *id.*, and "prevent the dissipation of [the] defendant's assets pending further action by the court," *Am. Bd. of Trade*, 830

F.2d at 436. This authority necessarily includes the power to investigate the defendant's transactions. *See SEC v. Koenig*, 469 F.2d 198, 202 (2d Cir. 1972). Moreover, where the entity in receivership is a corporation, the receiver may report to the SEC and convene shareholder meetings on its behalf. *Id.*

Yet the power of a securities receiver is not without limits. For example, we have "expressed strong reservations as to the propriety of allowing a receiver to liquidate [an estate]." *Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1965). In addition, because receivership should not be used as an alternative to bankruptcy, we have disapproved of district courts using receivership as a means to process claim forms and set priorities among various classes of creditors. *Am. Bd. of Trade*, 830 F.2d at 437-38.

More fundamentally, the authority of a receiver is defined by the entity or entities in the receivership. "[T]he plaintiff in his capacity of receiver has no greater rights or powers than the corporation itself would have." *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 25 (1st Cir. 1990) (internal quotation marks omitted). A receiver may commence lawsuits, but "stands in the shoes of the corporation and can assert only those claims which the corporation could have asserted." *Lank v. N.Y. Stock Exch.*, 548 F.2d 61, 67 (2d Cir. 1977).

C.      *Receivers and Fraudulent Conveyances*

Not surprisingly, the relatively few cases dealing with the issue have held that receivers have standing to pursue fraudulently conveyed assets only when one of the entities in receivership is a creditor of the transferor. This distinction is nicely explained in a pair of

Seventh Circuit decisions authored by Judge Posner. *See Troelstrup v. Index Futures Group, Inc.*, 130 F.3d 1274 (7th Cir. 1997); *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995).

In *Scholes*, Michael Douglas created three corporations and caused them, in turn, to create limited partnerships. *Scholes*, 56 F.3d at 752. The corporations were the general partners and sold limited partner interests to investors in a Ponzi scheme.[7] *Id.* In the civil enforcement action, the district court appointed one receiver to represent both Douglas and the corporations, who then sought to recover assets conveyed to third parties. *Id.* at 752-53. Those third parties argued that the receiver was suing on behalf of the investors, not Douglas or the corporations, and lacked standing to do so. *Id.* The Seventh Circuit disagreed, noting that the corporations – "Douglas's robotic tools" – were still distinct legal entities with separate rights and duties. *Id.* at 754. "The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys . . . that Douglas had made the corporations divert to unauthorized purposes." *Id.*

Once the "zombie" corporations were under the control of the receiver, the receiver's only object was "to maximize the value of the corporations for the benefit of their investors and any creditors." *Id.* at 755. The receiver pressed a claim that the corporations had a right to a return of their assets that had been distributed by Douglas in his scheme. Because Douglas

---

[7] A "Ponzi scheme" typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses. *See, e.g.*, *Orlack v. Kozyak (In re: Fin. Federated Title & Trust, Inc.)*, 309 F.3d 1325, 1327 n.2 (11th Cir. 2002); *see generally In re Ponzi*, 15 F.2d 113 (D. Mass. 1926).

-14-

controlled the corporations completely, the transfers were, in essence, coerced. *Id.* The court cautioned that if the receiver had been appointed to guard only Douglas's individual assets, the question of standing might have a different answer. *Id.*

Two and a half years later, the Seventh Circuit was presented with that exact situation in *Troelstrup* – the receiver was appointed only for the assets of the Douglas figure, John Tobin. *Troelstrup*, 130 F.3d at 1275-76. The court held that the receiver lacked standing to assert his claim. Looking back, the court said of *Scholes*:

> We held that [Douglas's] receiver, *who had also been appointed the corporations' receiver*, had standing to sue on behalf of the corporations, because they were entitled to the return of the money that the defrauder had improperly diverted from them. . . . Troelstrup . . . was just Tobin's receiver, and so he could not sue . . . on behalf of [the investment entity], not having been appointed its receiver.

*Id.* at 1277 (emphasis in original). Tobin's receiver lacked standing because he was "suing a third party on behalf of Tobin's creditors to enforce a personal right of theirs, not a right of Tobin's in which they have an interest by virtue of being his creditors." *Id.* We agree with the Seventh Circuit's analysis and hold that a receiver's standing to bring a fraudulent conveyance claim will turn on whether he represents the transferor only or also represents a creditor of the transferor.

D.     *The Receiver's Standing Under N.Y. Debtor & Creditor Law § 276*

Because he does not represent any creditor of Todd Eberhard, we conclude that the Receiver lacks standing to set aside the purported conveyance of Borderline NS under N.Y. Debtor & Creditor Law § 276. As in *Troelstrup*, the Receiver here stands only in the shoes of

-15-

Todd Eberhard. He can press only those claims that Eberhard himself could assert, *see Lank*, 548 F.2d at 67, and Eberhard, as transferor, may not bring an action to set aside his own fraudulent conveyance, *see Pattison*, 301 N.Y. at 73. A receiver "acquires no right . . . to the property fraudulently transferred for the reason that the transfer is valid against the debtor and cannot be set aside by the receiver as the debtor's successor. The transfer is good against every one except the creditors of the [transferor]." 2 Clark on Receivers § 364 (3d ed. 1959).

Indeed, the Receiver cites no authority to support his contention that he has standing to bring a claim under section 276.[8] Instead, he relies in large part on one line in *SEC v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005), where the district court stated that receivers "ha[ve] standing, for the benefit of those defrauded to recover fraudulently obtained funds that ha[ve] come to rest with a non-wrongdoing party." However, the receivership in *Shiv* – unlike the one at issue here – specifically included the corporations manipulated by the individual defendant. The receiver in *Shiv* had standing "for the benefit of those defrauded" because he was their receiver. *Id.* The Receiver here is not. Like his counterpart in *Troelstrup*, the Receiver in fact asserted a claim on behalf of Eberhard's creditors without representing any of them. He lacks

---

[8] In his April 14, 2008 letter submitted pursuant to Fed. R. App. P. 28(j), the Receiver points to N.Y. Estate Powers & Trusts Law § 13-3.6 as enabling a receiver to assert a state law fraudulent conveyance claim on behalf of creditors: "A fiduciary may, *for the benefit of creditors* or others interested in property held in trust, treat as void any act done . . . in fraud of the rights of any creditor . . . ." N.Y. Est. Powers & Trusts Law § 13-3.6 (emphasis added). However, that provision is expressly limited to "creditor[s] of . . . deceased insolvent debtor[s]," *id.*, and, in any event, was not the statute employed by the district court to undo the conveyance of Borderline NS. Nor does a statute that explicitly authorizes fiduciaries to act on behalf of creditors convey standing under an entirely different statute that just as explicitly limits relief only to creditors. *Compare id.*, *with* N.Y. Debt. & Cred. Law § 276.

standing to do so.

The Receiver argues that he, and not the SIPA trustee, is the only person who could bring a claim to set aside the transfer of Borderline NS, since the corporation was an asset of Todd Eberhard individually, not of EIA or Park South. This argument is utterly without merit. Under section 276, the conveyance may be set aside by *any* creditor of the transferor.[9] If EIA and Park South (entities under the control of the SIPA trustee) are creditors of Todd Eberhard, then, in Judge Posner's colorful words, "[f]reed from [Eberhard's] spell," and no longer his "evil zombies," the corporations would be entitled to the return of the assets that Eberhard unlawfully diverted from them.[10] *See Scholes*, 56 F.3d at 754. For that reason, the fact that Borderline NS is not, at present, an asset of EIA or Park South is not relevant for standing purposes. Any creditor of Todd Eberhard has standing to bring a claim under section 276 to reach fraudulently transferred assets.[11]

Finally, the Receiver contends that the power and authority of a federal securities receiver are matters of federal law. As a general proposition, we agree. Federal law supplies district

---

[9] As noted above, under section 276, creditors may set aside conveyances made with actual intent to defraud, and N.Y. Debtor & Creditor Law § 278(1)(a) provides that a creditor may have the fraudulent conveyance "set aside . . . to the extent necessary to satisfy his claim."

[10] On this record, it appears that Eberhard may have diverted funds from EIA to buy the Canadian Properties through Borderline NS. However, we pass no judgment on whether, under this or any other theory, EIA or Park South is, in fact, a creditor of Todd Eberhard

[11] We note that had the scope of the Receivership not been narrowed, this entire issue might have been avoided. If EIA and/or Park South remained within the estate and established creditor status, the Receiver would have represented a creditor of Todd Eberhard, and as in *Scholes*, would have met the standing requirement imposed by section 276.

-17-

courts appointing receivers with "broad equitable powers." *Am. Bd. of Trade*, 830 F.2d at 438. We have entrusted receivers with the responsibility to "conserve the existing estate" by unraveling and investigating the defendant's transactions. *See id.* at 436. Under this authority, the Receiver is free to claim (as he did before the district court) that the conveyance of Borderline NS did not occur. But that was not the ground chosen by the district court to set aside the conveyance, and federal law does not give a receiver, or a district court, the authority to re-write or ignore state law.

The district court's judgment was premised on a state fraudulent conveyance statute, governed by state law. The fact that the person asserting the claim is a federally appointed receiver does not federalize the law employed to attack the transaction. *See, e.g.*, *Freeman v. First Union Nat'l*, 329 F.3d 1231, 1233-34 (11th Cir. 2003) (certifying to Supreme Court of Florida the question of whether Florida law supports a claim by plaintiffs, including a federal receiver, for aiding and abetting a fraudulent transfer); *Scholes*, 56 F.3d at 753 ("The law under which the receiver proceeded is the Illinois law of fraudulent conveyances as it stood in 1989."). In fact, some federal receivers have enjoyed the benefit of state statutes imposing looser standing requirements. *See, e.g.*, *Stenger v. World Harvest Church, Inc.*, No. 1:04-CV-00151, 2006 WL 870310, at *4 n.6 (N.D. Ga. Mar. 31, 2006) (allowing receiver to pursue fraudulent conveyance claim under former Ga. Code. Ann. § 18-2-22 which provided that fraudulent conveyances were "null and void" as to "creditors *and others*" (emphasis added)).

N.Y. Debtor & Creditor Law § 276 is clear – a conveyance made with an intent to defraud is only "fraudulent as to . . . creditors." N.Y. Debt. & Cred. Law § 276. Since he represented

only Todd Eberhard and none of his creditors, the Receiver lacked standing to utilize section 276 to set aside the conveyance of Borderline NS.[12]  The district court's decision to the contrary was in error and, for that reason, we vacate the judgment of the district court.

3.      Seventh Amendment Right to a Jury Trial[13]

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII.  The phrase "Suits at common law" refers to "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered."  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 447 (1830)).  In *Granfinanciera*, the Supreme Court set forth a two-part test to determine whether a particular action is a suit at law.  The first step focuses on "whether the action would have been deemed legal or equitable in 18th century England," *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1328 (2d Cir. 1993), while the second, more important step requires a determination as to whether "the remedy sought . . . is legal or equitable in nature," *Granfinanciera*, 492 U.S. at 42; *see also* *Pereira v. Farace*, 413 F.3d 330, 337-39 (2d Cir. 2005).

As one might expect, both parties attempt to define the nature of the action and the

--------

[12] We caution that our conclusion that the Receiver lacked standing should not be read as an endorsement of the existence or legitimacy of the conveyance itself.

[13] We review a district court's decision to deny a jury trial de novo.  *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 299 (2d Cir. 2006).

remedy at issue in ways that bolster their respective positions. According to Appellant, the present action seeks to set aside a fraudulent transfer of real property – the Canadian Properties – which she argues is an action at law. The Receiver correctly notes that the Canadian Properties themselves were not transferred; they are assets of Borderline NS. What was allegedly conveyed was the stock of Borderline NS, and, according to the Receiver, an action to set aside a fraudulent transfer of an intangible is an action at equity under *Granfinanciera*. *See* 492 U.S. at 44 (quoting 1 G. Glenn, Fraudulent Conveyances & Preferences § 98 (rev ed. 1940)). Ultimately, neither of these labels accurately describes either the nature of the action or the remedy sought. Having concluded that the Receiver lacks standing to bring an action under New York's fraudulent conveyance laws, we define the action in this case by reference to Sandi Eberhard's intervention in these proceedings. Appellant intervened to assert, *inter alia*, her claim of ownership and to recover the stock claimed by the Receiver and padlocked by the court. The remedy she sought was "an order directing the receiver to turn over [the] property." 3 Clark on Receivers § 664 (3d ed. 1959). Historically, these actions have been considered actions at law.

The Supreme Court, noting the difficulty in devising a general rule to distinguish between equitable and legal actions, has said that one of the few areas beyond dispute is that an action "for the recovery and possession of specific, real, or personal property . . . is one at law." *Pernell v. Southall Realty*, 416 U.S. 363, 370 (1974) (quoting *Whitehead v. Shattuck*, 138 U.S. 146, 151 (1891)).[14] This includes actions to recover possession of property claimed by a

[14] Although shares of stock are considered intangible property under New York law, *see Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006); *see also Agar v. Orda*, 264 N.Y. 248, 251 (1934), they are the intangible *personal* property of the shareholder. *See AFP*

receiver. Specifically, "a party claiming the right to the possession of the property as against the receiver or any one else is entitled to a jury trial . . . ." *Keyser v. Erickson*, 211 P. 698, 701 (Utah 1922). More than a century ago, we stated that parties with claims to receivership property "are entitled to their day in court, and the receiver must proceed by suit in the ordinary way to try his right to the property, or the plaintiff must bring them in as parties to the action, and apply to have the receivership extended to the property in their hands." *Wheaton v. Daily Tel. Co.*, 124 F. 61, 62 (2d Cir. 1903). Where that claim is for the right to possession, the Seventh Amendment guarantees a jury trial.[15]

Here, the remedy Appellant seeks is recovery and possession of stock in Borderline NS, relief historically granted in courts of law. Although it is not entirely clear from the record who possessed the stock at the time the Receiver was appointed,[16] Appellant's intervention seeks to

*Imaging Corp. v. Ross*, 780 F.2d 202, 204 (2d Cir. 1985) ("New York follows the majority American rule, which treats shares of stock as the personal property of the shareholders."). In addition, New York recognizes that the intangible property interest in shares may merge with the stock certificate and, in certain instances, be treated as part of an action for specific property. *See Agar*, 264 N.Y. at 251; *Pierpont v. Hoyt*, 260 N.Y. 26 (1932) (recognizing an action for wrongful conversion of stock).

[15] To be sure, as several cases of more recent vintage illustrate, the underlying remedy sought determines whether a claim to receivership property is a claim at law. Where the third party's claim was based on an objection to the district court's "comprehensive equitable remedy" of distribution, summary proceedings were appropriate. *See SEC v. Am. Capital Invs., Inc.*, 98 F.3d 1133, 1147 (9th Cir. 1996). Receivers were also permitted to proceed summarily where third parties' claims were premised on equitable rights, like disgorgement, *see SEC v. Wencke*, 783 F.2d 829, 836 (9th Cir. 1986), or setoff, *see United States v. Ariz. Fuels Corp.*, 739 F.2d 455, 456, 459 (9th Cir. 1984). In each of these cases, no jury trial was necessary because the underlying remedy was equitable, not legal.

[16] As noted above, Appellant has produced documents that reflect the alleged transaction in June 2002 and proffered testimony from the property manager who purportedly prepared them.

-21-

vindicate her asserted right to own and possess that property. *Cf. Pernell*, 416 U.S. at 371 (stating that the "distinction between title to and possession of property . . . had no bearing on the right to a jury trial"). Regardless of the merits of her claim, we conclude that the Seventh Amendment entitles her to have it tried before a jury. The district court's denial of Appellant's request for a jury trial violated her rights under the Seventh Amendment and therefore provides a further ground for vacating the district court's judgment against her. Thus, we need not reach Appellant's preference among creditors and constructive trust arguments.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

---

However, Todd Eberhard continued to make payments on the Citibank loan long after June 2002 and Sandi reported no interest in the corporation until after her son's arrest. In addition, their prior attempt to mislead the court regarding this transaction calls the documentary evidence into serious question. We also note that Borderline NS's entry in the Nova Scotia Registry of Joint Stock Companies shows no activity whatsoever in June 2002, and no subsequent change of directors until January 2007. *See* Borderline Development NS, Inc., Nova Scotia Registry of Joint Stock Companies, https://rjsc.gov.ns.ca/rjsc/search/inquiry.do (Go to "Search Database" and Keyword Search: "Borderline NS").