# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 23, 2012

No. 11-10704

Lyle W. Cayce
Clerk

RALPH S. JANVEY, as Court-Appointed Receiver for the Stanford
International Bank, Ltd., et al.,

Plaintiff-Appellee,

v.

DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, INC.;
DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, INC.;
NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE;
REPUBLICAN NATIONAL COMMITTEE; and NATIONAL REPUBLICAN
SENATORIAL COMMITTEE,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before JOLLY, BENAVIDES, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Ralph Janvey, the Receiver over Allen Stanford and his companies' assets
(collectively, the Stanford Defendants),[1] brought this case under the Texas
Uniform Fraudulent Transfer Act ("TUFTA"), TEX. BUS. & COM. CODE § 24.001

---

[1] Stanford ran a Ponzi scheme through his companies, one of the largest in U.S. history.
*See* Juan A. Lozano, *Allen Stanford Gets 110 Years in Prison for $7B Ponzi Scheme*, CHRISTIAN
SCIENCE MONITOR, June 14, 2012, http://www.csmonitor.com/Business/Latest-News-Wires/
2012/0614/Allen-Stanford-gets-110-years-in-prison-for-7B-Ponzi-scheme.

et seq., to recover approximately $1.6 million in political contributions made to various political committees by the Stanford Defendants between 2000 and 2008. There are two Democratic committees—the Democratic Senatorial Campaign Committee ("DSCC") and the Democratic Congressional Campaign Committee ("DCCC") ("the Democratic Committees")—and three Republican committees—the Republican National Committee ("RNC"), the National Republican Senatorial Committee ("NRSC"), and the National Republican Congressional Committee ("NRCC") ("the Republican Committees")—which, for convenience, we collectively refer to as "the Committees." The district court granted summary judgment in favor of the Receiver, and the Committees appealed.

On appeal, the Committees advance three arguments. They are that (1) the Receiver may not stand in the shoes of the creditors of the Stanford Defendants as to the TUFTA claims, (2) the Receiver's action was untimely under TUFTA, and (3) federal campaign finance law preempts the Receiver's TUFTA claims. Because we conclude that (1) the Receiver may stand in the shoes of the creditors of the Stanford Defendants, (2) the Receiver's TUFTA claims were brought "within one year after the transfer[s] . . . w[ere] or reasonably could have been discovered by the claimant," TEX. BUS. & COM. CODE § 24.010(a)(1), and (3) they are not preempted, we reject the Committees' arguments and, therefore, AFFIRM the judgment of the district court.

## BACKGROUND

The Securities Exchange Commission ("SEC") brought suit against the Stanford Defendants in 2009 for perpetrating an enormous Ponzi scheme. *See Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009). The district court appointed Janvey to be Receiver over the assets and the records of the Stanford Defendants (the Receivership Estate). The court "specifically directed and authorized [the Receiver] to . . . [c]ollect, marshal, and take custody, control, and possession of

No. 11-10704

all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated." The Receiver was also directed to file "such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate" with the same court.

On February 19, 2009 and pursuant to its directive, the Receiver filed the instant lawsuit to recover approximately $1.6 million worth of contributions made by the Stanford Defendants to the Committees. It is undisputed that the Stanford Defendants gave $950,500 to the DSCC; $238,500 to the NRCC; $200,000 to the DCCC; $128,500 to the RNC; and $83,345 to the NRSC. The Receiver contends that the Committees have to disgorge the above funds because the contributions were fraudulent transfers, given "with actual intent to hinder, delay, or defraud" creditors of the Stanford Defendants. *See* TEX. BUS. & COM. CODE § 24.005(a).

The Committees each filed a motion to dismiss, and the Receiver and the Republican Committees moved for summary judgment. The district court granted the Receiver's motion for summary judgment and denied the motions to dismiss and the Republican Committees' motion for summary judgment. The court ruled that the Receiver stands in the shoes of the creditors of the Stanford Defendants and therefore may bring the TUFTA claims and determined that the Receiver's TUFTA actions were timely. The district court also concluded that federal campaign finance law[2] does not preempt the Receiver's state law claim. On the merits, the district court determined that summary judgment in favor of

---

[2] Specifically, the Committees refer to the Federal Campaign Act of 1971 ("FECA"), 86 Stat. 3 (1972), *amended by* Bipartisan Campaign Reform Act of 2002 ("BCRA"), 116 Stat. 81, 2 U.S.C. § 431 et seq., and the regulations implementing the FECA and BCRA.

3

No. 11-10704

the Receiver was warranted because he had demonstrated that the Stanford Defendants gave contributions to the Committees with actual intent to defraud, as required by TUFTA.  The district court was unconvinced that the statutory defense available for contributions taken "in good faith *and* for a reasonably equivalent value," TEX. BUS. & COM. CODE § 24.009(A), applied because the Committees failed to create a genuine issue of material fact regarding whether the contributions were given for a reasonably equivalent value.

The Committees timely appealed, raising three issues: (1) whether the Receiver may stand in the shoes of the creditors of the Stanford Defendants as to the TUFTA claims; (2) whether the Receiver's action was untimely under TUFTA; and (3) whether federal campaign finance law preempts the Receiver's TUFTA claims.

## STANDARD OF REVIEW

We review *de novo* a district court's disposition of motions to dismiss  and motions for summary judgment.  *E.g.*, *LeClerc v. Webb*, 419 F.3d 405, 413 (5th Cir. 2005).

## DISCUSSION

### A.

The Committees first dispute the district court's conclusion that the Receiver stands in the shoes of the creditors of the Stanford Defendants and that he is therefore empowered to bring the TUFTA claims.  We disagree and conclude that the Receiver has the authority to pursue the instant action on behalf of the creditors.

The Committees highlight that the district court relied on language from *Janvey v. Alguire*, 628 F.3d 164 (5th Cir. 2010) (*Alguire I*), in reaching its conclusion that the Receiver may bring claims on behalf of the creditors of the Stanford Defendants.  The Committees correctly note that this language does not appear in *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) (*Alguire II*), the opinion

4

that replaced and superseded *Alguire I.* Nonetheless, although we reached a different conclusion in *Alguire II*, *id.* at 603-04, this is not because we concluded that the Receiver represented the company rather than the creditors.[3] Thus, although *Alguire II* does not include the language on which the district court relied, it also does not reject this language or the reasoning underpinning it.[4] Moreover, we subsequently recognized, in *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955 (5th Cir. 2012), that under Texas law—which also governs this appeal—"[a] receiver is 'the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property of the receivership.'" *Id.* at 966 (quoting *Sec. Trust Co. of Austin v. Lipscomb Cnty.*, 180 S.W.2d 151, 158 (Tex. 1944)). Thus, "'when the receiver acts to protect innocent creditors . . . he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so.'" *Id.* (quoting *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. E-Court, Inc.*, 2003 WL 21205030 at \*5 (Tex. Ct. App. 2003)).[5] Not only is *Jones* controlling, but its reasoning finds support in the decisions of several other circuits. *See, e.g.*, *Marion v. TDI Inc.*, 591 F.3d 137, 148 (3d Cir. 2010); *Wulliger v. Man. Life Ins.*

---

[3] Rather, we concluded that we did not have jurisdiction to decide whether the receiver's claims were subject to arbitration because the district court had not issued an order deciding the defendants' motion to compel arbitration. *Id.*

[4] Notably, in *Alguire II*, we continued to refer to the receiver as representing the interests of the creditors in the TUFTA context. *Id.* at 601.

[5] The Committees submit that *Jones* is distinguishable because we further noted that the receiver in that case was authorized by the order appointing him "to pursue actions for the benefit of 'all investors who may be the victims of the fraudulent conduct'" of the receivership entities, *id.* at 966, and that this language does not appear in the appointment order here. We disagree. *Jones* does not require that such language appear in an appointment order before a receiver may exercise the authority given to him under Texas law. Regardless, the order appointing the Receiver in this case included language even broader than that cited in *Jones*; the Receiver is authorized to institute actions to recover any "assets . . . traceable to the Receivership Estate," and it is undisputed that the contributions at issue are traceable to the Receivership Estate.

No. 11-10704

*Co.*, 567 F.3d 787, 795 (6th Cir. 2009); *Donell v. Kowell*, 533 F.3d 762, 776-77 (9th Cir. 2008); *Eberhard v. Marcu*, 530 F.3d 122, 132-33 (2d Cir. 2008); *Scholes v. Lehmann*, 56 F.3d 750, 753-54 (7th Cir. 1995).  Accordingly, we conclude that the Receiver represents the creditors, via the Stanford corporations, in pursuing the TUFTA claims.

B.

1.

Given that the Receiver may represent the creditors in pursuit of the TUFTA claims, the next question we must answer is whether the Receiver filed the instant action "within one year after the transfer[s] . . . w[ere] or reasonably could have been discovered by the claimant."   TEX. BUS. & COM. CODE § 24.010(a)(1).

"A defendant moving for summary judgment on the affirmative defense of limitations has the burden to establish that defense conclusively."  *Johnston v. Crook*, 93 S.W.3d 263, 269 (Tex. App. 2002) (citing *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999)).  "Thus, the defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of its injury."  *Id.* (citing *KPMG Peat Marwick*, 988 S.W.2d at 748).  "If the movant establishes that the statute of limitations bars the action, the non-movant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations."  *Id.* (citing *KMPG Peat Marwick,* 988 S.W.2d at 748).

"The discovery rule [in TEX. BUS. & COM. CODE § 24.010] defers the accrual of a cause of action until the plaintiff knew or, through the exercise of reasonable diligence, should have known of the facts giving rise to the cause of action."

No. 11-10704

*Cadle Co.*, 136 S.W.3d at 350. "When a plaintiff knew or should have known of an injury is generally a question of fact." *Id.* at 352. "However, if reasonable minds could not differ about the conclusion to be drawn from the facts in the record, then the start of the limitations period may be determined as a matter of law." *Id.*

2.

The Committees argue that the Receiver reasonably could have discovered the fraudulent transfers, at the very latest, by February 18, 2009.[6] They contend that the existence of the donations was not "inherently undiscoverable" because records of the donations were available online (for instance, on the websites of the Federal Election Commission ("FEC") and Open Secrets) and because the donations were discussed in the media.

The Committees' argument misses the mark. Even if the existence of the donations was discoverable, their fraudulent nature was not. Moreover, when the Receiver was first appointed on February 16, 2009, he had a number of duties to attend to, which involved the many Stanford offices, systems, and employees, and, because February 16, 2009 fell on Presidents' Day, he was not able to enter the Stanford offices until February 17, 2009. Given the extent of the Stanford enterprises, the Receiver's duties with regard to them, and the extent of the fraudulent transfers, it would not have been reasonable to expect him to immediately discover the fraud. Moreover, the Political Committees submitted no summary judgment evidence indicating that the Receiver actually discovered the transfers earlier than February 20, 2009. The burden is on the Committees to "(1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law there is no genuine issue of material fact about

---

[6] Because the Receiver filed suit on February 19, 2010, accepting the Committees' argument would mean that the Receiver failed to bring suit within the limitation period.

when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of its injury." *Cadle*, 136 S.W.3d at 352. Accordingly, we reject their argument and conclude that, based on the record made in support of summary judgment, the Receiver exercised reasonable diligence and thus brought the action within one year of when the transfers reasonably could have been discovered.

3.

Finally, and related to their argument regarding to the discovery rule, the Committees assert that the district court abused its discretion in denying their discovery request (a motion to compel) and that they were prejudiced as a result. Specifically, the Committees requested that the Receiver be compelled to produce correspondence relating to, and several drafts of, documents that he had issued regarding the contributions made to the Committees. The Committees claim that the documents may contain metadata indicating that they were created before February 19, 2009. The Receiver refused on multiple grounds, but a common thread was that the requested documents and correspondence were protected by attorney-client privilege and work-product doctrine. However, the Receiver provided the Committees with a log of the documents that were withheld, and the district court reviewed the documents *in camera* and determined that they did not fall under the exception to the privilege and the doctrine outlined in *Conkling v. Turner*, 883 F.2d 431 (5th Cir. 1989).[7]

On appeal, the Committees do not dispute that the documents are privileged. Rather, the Committees contend that the *Conkling* exception applies because the materials sought will help determine when the Receiver discovered,

---

[7] In *Conkling*, the plaintiff claimed that a statute of limitations should be equitably tolled because he did not know that a defendant's statement was false until his (the plaintiff's) attorney informed him of such. *Id.* at 434. Because the plaintiff "injected into [the] litigation the issue of when he knew or should have known of the falsity of [the defendant's] assertion," we permitted the defendants to conduct a limited deposition of the plaintiff's attorney. *Id.*

or reasonably could have discovered, the *contributions* made to the Committees. However, the ultimate question is when the Receiver knew or should have known about the *fraudulent nature* of the contributions, not just their existence. Thus, the district court would have been obliged to find the *Conkling* exception inapplicable if none of the sealed documents tended to show that the Receiver, prior to the crucial date, not only knew that the contributions had been made but also that they had been made with fraudulent intent.

Even if we assume, for the sake of argument, that the district court erred in not applying the *Conkling* exception, the Committees have failed to preserve this issue for appeal by failing to provide any meaningful way to review the disputed documents. Had the Committees wished to pursue this argument, they should have moved to have the documents, along with any metadata, made available for review. *See, e.g.*, *Miss. Pub. Employees' Retirement Sys. v. Boston Scientific Corp.*, 649 F.3d 5, 30 n.22 (1st Cir. 2011). The district court examined the documents, determined that it was not necessary to look at the metadata they may have contained, and concluded that they did not fit the criteria for the *Conkling* exception to apply. Absent a meaningful way to review the disputed documents, it is not possible to examine whether the district court abused its discretion by denying the Committees' discovery request as to the documents.

Furthermore, insofar as the Committees suggest that the district court's *in camera* review of the hardcopy documents was inadequate because it did not include the metadata itself, their argument is waived because they did not raise it until their reply brief. *E.g.*, *Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 702 (5th Cir. 2010). Consequently, we cannot say that the district court abused its discretion in denying the Committees' discovery request.

No. 11-10704

## C.

The Committees' third defense is that federal campaign finance law preempts the Receiver's TUFTA claims. "Preemption can take multiple forms: Congress can expressly preempt state law in federal statutory language, or it can impliedly preempt state law." *Castro v. Collecto, Inc.*, 634 F.3d 779, 785 (5th Cir. 2011). Implied preemption may take two forms: field preemption and conflict preemption. *Id.* Field preemption applies "where federal law 'is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation,' or 'the federal interest [in the field] is so dominant' that it 'preclude[s] enforcement of state laws on the same subject.'" *Id.* (quoting *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)) (citations omitted). Conflict preemption applies "(1) where complying with both federal law and state law is impossible; or (2) where the state law 'creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 563-64 (2009) (internal quotation marks omitted)). Reviewing each form of preemption, we conclude that none applies and that, therefore, the Receiver's TUFTA claim is not preempted.

## 1.

The Committees argue that FECA expressly preempts the Receiver's TUFTA claim because it preempts "any provision of State law with respect to election to federal office." 2 U.S.C. § 453. We disagree.

TUFTA is a general state law that happens to apply to federal political committees in the instant case. In cases like this one, we have rejected express preemption arguments and construed § 453 narrowly. For instance, in *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273 (5th Cir. 1994), we rejected a federal candidate's argument that FECA preempted a company's state law cause of action against him for the debts of his campaign committee:

Although Thornburgh attempts to stretch § 453 far enough to create a preemptive bar to applying state law to hold federal candidates personally liable, we cannot read FECA as extending that far.  First, a "strong presumption" exists against preemption, and "courts have given section 453 a narrow preemptive effect in light of its legislative history."  In addition, nowhere in the text of FECA or accompanying regulations is the personal liability of a candidate addressed. Finally, the Federal Election Commission ("FEC") has opined that state law supplies the answer to the question who may be held liable for campaign committee debts. Accordingly, in light of the FEC's view, the strong presumption against preemption, the historically narrow reading of § 453, and FECA's silence on the issue of candidate liability, we conclude that Thornburgh's argument for express preemption must fail.

*Id.* at 1280 (footnotes and citations omitted); *see also Stern v. Gen. Electric Co.*, 924 F.2d 410 (2d Cir. 1991) (holding that § 453 does not preempt a state law establishing a company's directors' fiduciary duty to shareholders, including not wasting corporate assets, and explaining that "the narrow wording of [§ 453] suggests that Congress did not intend to preempt state regulation with respect to non-election-related activities"); *Reeder v. Kans. City Bd of Police Comm'ers*, 733 F.2d 543 (8th Cir. 1984) (holding that § 453 did not preempt a state law prohibiting officers or employees of the Kansas City Police Department from making any political contribution); *Friends of Phil Gramm v. Ams for Phil Gramm in '84*, 587 F. Supp. 769 (E.D. Va. 1984) (holding that § 453 did not preempt a state law prohibiting unauthorized use of a person's name for advertising or commercial purposes).

The cases that the Committees cite are all inapposite because they pertain to state laws that specifically regulated federal campaign finance in contravention of FECA's preemption provision.  *See Teper v. Miller*, 82 F.3d 989 (11th Cir. 1996) (state law effectively prohibiting Georgia legislators from accepting donations for a federal campaign while the state General Assembly was in session); *Bunning v. Ky.*, 42 F.3d 1008 (6th Cir. 1994) (state law

authorizing investigation of campaign expenditures of a federal political committee); *Weber v. Heaney*, 995 F.2d 872 (8th Cir. 1993) (state law establishing system under which federal congressional candidates could agree to limit their federal expenditures in exchange for state funding for their campaigns).

Nor does TUFTA implicate the "core concerns" of FECA. As the Receiver correctly explains, he does not seek a refund of the contributions. Rather, the TUFTA claims are brought on behalf of the creditors of the Stanford Defendants and assert that the contributions should not have been made in the first place. Accordingly, § 453 does not expressly preempt the Receiver's TUFTA claims.

2.

The Committees next argue that field preemption applies. However, because Congress has not occupied the field with regard to claims like those brought under TUFTA and because courts have consistently indicated that FECA's preemptive scope is narrow in light of its legislative history, *see, e.g., Karl Rove*, 39 F.3d at 1281; *Stern*, 924 F.2d at 475 n.3; *Weber*, 995 F.2d at 876, we conclude that field preemption does not apply.

First, the Committees contend that § 441a-k of FECA states a "comprehensive list" of illegal sources for campaign contributions[8] and that TUFTA impermissibly designates another source of "illegal" contributions. This, the Committees argue, is consistent with "[t]he primary purpose of FECA, [which] . . . is to regulate campaign contributions and expenditures in order to eliminate pernicious influence—actual or perceived—over candidates by those who contribute large sums." *Karl Rove*, 39 F.3d at 1281. But, as the Receiver

---

[8] These provisions establish: limitations on the amount that may be given, § 441a; restrictions on who may give, § 441b-f; limitations on the contribution of currency, § 441g; regulation of soft money, § 441i; and a prohibition on fraudulent misrepresentation of campaign authority, § 441h.

correctly observes, this appeal pertains to an impermissible source of funds for the contributor (the Stanford Defendants), not the Committees, and § 441a-k only pertains to the latter. Moreover, as the district court noted, neither Congress nor the FEC "has ever attempted to graft any of these potential uses of erstwhile campaign contributions onto the purportedly exclusive list of prohibited limitations on contributions and expenditures." Finally, the Committees' argument would lead to absurd results: under their interpretation, they would be allowed to keep funds that were, for example, stolen by force or fraud so long as the contributions did not run afoul of § 441a-k.

Second, the FEC, in advisory opinions cited by the district court, has ruled that candidates and political committees remain subject to state contract law. FEC Adv. Op. 1989-02 at 2 (Apr. 25, 1989); FEC Adv. Op. 1975-102 at 1 (Jan. 29, 1976). This suggests that Congress had no intention to "occupy the field" with regard to campaign finance such that state fraudulent transfer laws would be preempted. Given this, field preemption does not apply.

3.

Finally, we conclude that conflict preemption does not apply here. First, the Committees argue that because FECA does not designate fraudulent transfers as illegal, TUFTA must conflict with FECA. This is a rehashing of the Committee's argument regarding field preemption—namely, that because § 441a-k of FECA states a "comprehensive list" of illegal sources for campaign contributions, TUFTA impermissibly designates another source of "illegal" contributions by allowing the Receiver's claims—which we have already rejected. Accordingly, for the same reason that field preemption does not apply on this basis, neither does conflict preemption.

Second, the Committees maintain that the Receiver's TUFTA claims conflict with the BCRA's soft money provisions. They submit that because the BCRA requires them to dispose of all soft money, they may not be compelled,

under state law, to return that money.  We find this argument unpersuasive.  It depends on characterizing the Receiver's TUFTA claim as a refund, which as previously discussed is inaccurate because the TUFTA claim is brought on behalf of the creditors of the Stanford Defendants and alleges that the contributions should not have been made in the first place.  Furthermore, the Receiver does not seek recovery of the exact soft money funds that the Committees asserts have now been spent.  *See* TEX. BUS. & COM. CODE § 24.009(b) ("[T]he creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less.").  Nor does the fact that the original funds have been spent preclude the Receiver from asserting his claim. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 776 & n.9 (9th Cir. 2008) (noting, in a fraudulent transfer case, that claims may often arise "years after the money has been received and spent" by the recipient but explaining that such claims are nonetheless permitted).  Accordingly, conflict preemption does not apply.

## CONCLUSION

For these reasons, we AFFIRM the district court's judgment.