# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 18, 2013

No. 11-10704

Lyle W. Cayce
Clerk

RALPH S. JANVEY, as Court-Appointed Receiver for the Stanford International Bank, Ltd., et al.,

Plaintiff-Appellee,

v.

DEMOCRATIC SENATORIAL CAMPAIGN COMMITTEE, INC.; DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE, INC.; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; REPUBLICAN NATIONAL COMMITTEE; and NATIONAL REPUBLICAN SENATORIAL COMMITTEE,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before JOLLY, BENAVIDES, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Acting on our own motion, in order to correct error in our prior opinion, *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 699 F.3d 848 (5th Cir. 2012), we withdraw that opinion and substitute the following:

\* \* \*

No. 11-10704

R. Allen Stanford ("Stanford") created and perpetrated a "Ponzi scheme"[1] that has given rise to issues of fraudulent-conveyance law, which this appeal requires us to consider. What follows is a simplified overview of how the scheme operated: Stanford created and owned Stanford International Bank, Ltd. ("SIBL") and a network of other entities (collectively, the "Stanford corporations") through which he sold certificates of deposit ("CDs") to the investing public, promising buyers extraordinarily high rates of return. Through his corporations, Stanford represented to prospective investors that their funds would be reinvested in high-quality securities so as to yield the investors the high rates of return purportedly guaranteed by the CDs. The vast majority of the money thus raised, however, was not reinvested in legitimate securities but rather was used mainly to pay investors the promised returns. These payments gave the scheme credibility, enabling Stanford to sell additional CDs. Although precisely when the scheme was launched is not certain, the Receiver presented the expert opinion of a certified public accountant, Karyl Van Tassel ("Van Tassel"), who, upon review of the Stanford corporations' books, interviews with numerous employees, and examination of a number of investors' and other institutions' records, together with the guilty plea and rearraignment statements of James M. Davis ("Davis"), Stanford's Chief Financial Officer, determined that the Stanford Ponzi scheme began and was insolvent as early as 1999 and that it was continuously operated in this manner and condition until it began to unravel in October 2008. By the time the scheme collapsed in February 2009, the Stanford corporations had raised in excess of $7 billion from the sale of the fraudulent CDs. Stanford and Davis were prosecuted for and convicted of

---

[1] "A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008) (citing authorities).

numerous federal offenses in their operation of the Ponzi scheme and are currently serving federal prison sentences.

The Securities and Exchange Commission ("the SEC") brought a civil suit against Stanford, his agents, and his corporations on February 16, 2009, charging multiple violations of federal securities laws. The SEC asked the district court to appoint a receiver for Stanford and his companies in order to preserve the Stanford corporations' resources and pursue the corporations' assets that were in the hands of third parties as the result of fraudulent conveyances. The court obliged, appointing Ralph S. Janvey ("the Receiver") as receiver over Stanford, his associates, his corporations, and their assets on February 16, 2009.

## I. Factual and Procedural Background

Pursuant to his duty as court-appointed receiver, Janvey filed this fraudulent-transfer suit on February 19, 2010 against several national political committees (collectively, "the Committees")[2] to recover approximately $1.8 million in political contributions that Stanford, Davis, and the Stanford corporations made to the Committees over a period covering the nine years between 2000 and 2008. The parties agree that between February 2000 and May 2008, Stanford, Davis, and the Stanford corporations made forty-nine contributions totaling: $950,500 to the DSCC; $200,000 to the DCCC; $128,500 to the RNC; $83,345 to the NRSC; and $238,500 to the NRCC. The law under which the Receiver proceeded is the Texas Uniform Fraudulent Transfer Act

---

[2] There are two Democratic committees—the Democratic Senatorial Campaign Committee ("DSCC") and the Democratic Congressional Campaign Committee ("DCCC")—and three Republican committees—the Republican National Committee ("RNC"), the National Republican Senatorial Committee ("NRSC"), and the National Republican Congressional Committee ("NRCC").

No. 11-10704

("TUFTA"), TEX. BUS. & COM. CODE § 24.001 et seq.[3]  The Committees moved to dismiss, and the Republican Committees moved for summary judgment, on the grounds that the Receiver's suit was untimely under TUFTA and that TUFTA is preempted by federal law as to political contributions to the Committees. Additionally, the Receiver moved for summary judgment on the TUFTA claims. The district court denied the Committees' motions and granted summary judgment in favor of the Receiver against each of the Committees and entered a judgment against the Committees in the amount of the contributions made as fraudulent conveyances.  The Committees appealed.

## II.  Standing and Knowledge in Ponzi-Scheme Cases

At the threshold, we confront and correct errors of law pertaining to standing and imputed knowledge, relied on by the parties and the district court and based on this court's erroneous prior, withdrawn opinions, that could otherwise affect our correct understanding and decision of the questions presented by this case.  In previous panel opinions, now withdrawn, this court erroneously asserted that a federal equity receiver has standing to assert the claims of the investor-creditors of a corporation in receivership against third-party transferees who receive assets of the corporation that were fraudulently conveyed to them by the principal of a Ponzi scheme who owned the corporation and used its funds to make the transfers.  *See Janvey*, 699 F.3d at 848 (withdrawn by the instant opinion); *Janvey v. Alguire*, 628 F.3d 164 (5th Cir. 2010) (*Alguire I*), *withdrawn*, *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011)

---

[3] The Receiver asserted federal-court jurisdiction on the basis of 15 U.S.C. § 78aa, 28 U.S.C. § 754, and the order appointing him receiver, which specifically authorizes the Receiver to "[i]nstitute such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate" and provided that "[a]ll such actions shall be filed in" the U.S. District Court for the Northern District of Texas.  The district court exercised ancillary jurisdiction over the Receiver's TUFTA claims pursuant to 28 U.S.C. § 1367.  *See Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995).

No. 11-10704

(*Alguire II*).  Relying on that error of law, the district court in the present case reasoned that, because the Receiver had standing to assert, and was asserting, the claims of investor-creditors of the corporations in receivership, rather than the claims of the corporations themselves, knowledge of the principal's fraud could not be imputed to the investor-creditors or cause the limitations period to run against their claims.  The district court's result was correct, but the rationale it used was wrong.  As we explain more fully below, a federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors, but the knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations.  Thus, once freed of his coercion by the court's appointment of a receiver, the corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted to third parties without receiving reasonably equivalent value.

The leading case explaining the principles that govern a federally appointed receiver's action under a state law adopting the Uniform Fraudulent Transfer Act ("UFTA") to recover assets that the operator of a Ponzi scheme caused to be fraudulently transferred to a third party without fair consideration is *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1995), *cert. denied sub nom. African Enter., Inc. v. Scholes*, 516 U.S. 1028 (1995).  In that case, Judge Posner explained that an equity receiver may sue to redress only injuries to the entity in receivership, *id.* at 753 (citing *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)), but that a receiver may sue on behalf of the receivership entity under a state uniform-fraudulent-transfer law to recover assets fraudulently transferred by the Ponzi-scheme principal without commensurate consideration to third parties.  *Id.* at 753-55.  In *Eberhard v. Marcu*, the Second Circuit summarized *Scholes* as follows:

5

No. 11-10704

In *Scholes*, Michael Douglas created three corporations and caused them, in turn, to create limited partnerships. The corporations were the general partners and sold limited partner interests to investors in a Ponzi scheme. In the civil enforcement action, the district court appointed one receiver to represent both Douglas and the corporations, who then sought to recover assets conveyed to third parties. Those third parties argued that the receiver was suing on behalf of the investors, not Douglas or the corporations, and lacked standing to do so. The Seventh Circuit disagreed, noting that the corporations—"Douglas's robotic tools"—were still distinct legal entities with separate rights and duties. "The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys . . . that Douglas had made the corporations divert to unauthorized purposes."

Once the "zombie" corporations were under the control of the receiver, the receiver's only object was "to maximize the value of the corporations for the benefit of their investors and any creditors." The receiver pressed a claim that the corporations had a right to a return of their assets that had been distributed by Douglas in his scheme. Because Douglas controlled the corporations completely, the transfers were, in essence, coerced.

530 F.3d 122, 132 (2d Cir. 2008) (footnote omitted) (citations omitted).

In *Scholes*, the court added: "Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated." 56 F.3d at 754-55 (citing *McCandless v. Furlaud*, 296 U.S. 140, 160 (1935), and *Albers v. Continental Ill. Bank & Trust Co.*, 17 N.E.2d 67 (1938)). The court went on: "Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas." *Id.*

The rationale of *Scholes*, which allows a federal equity receiver to assert the claims of a receivership entity against third-party recipients of the entity's

6

No. 11-10704

assets that have been fraudulently transferred by the principal of the Ponzi scheme has been endorsed by this court and several other federal courts of appeals[4] as well as a large number of district courts.[5]

Applying the principles of *Scholes* and its progeny, we conclude that the Receiver has standing to assert the claims of SIBL, and any other Stanford entity in receivership, against the Committees to recover the contributions made to them without reasonably equivalent value by the Stanford Ponzi operation. We do not agree with the Committees' argument that because the Stanford corporations knew of both the donations to the Committees and their fraudulent origins from the moment they were made, the time to recover the donations

---

[4] *See Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 967 (5th Cir. 2012) (examining *Scholes* and noting that "[o]ther courts have likewise rejected the *in pari delicto* defense in actions brought by receivers to recover assets for investors and creditors"); *Donell v. Kowell*, 533 F.3d 762, 767, 777 (9th Cir. 2008) ("The Receiver has standing to bring this suit because, although the losing investors will ultimately benefit from the asset recovery, the Receiver is in fact suing to redress injuries that Wallenbrock suffered when its managers caused Wallenbrock to commit waste and fraud."); *Eberhard*, 530 F.3d at 132; *see also Wing v. Dockstader*, 482 F. App'x 361, 363 (10th Cir. 2012) (unpublished); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (discussing *Scholes*).

[5] *See, e.g.*, *Wing v. Hammons*, No. 2:08-CV-00620, 2009 WL 1362389, at *3 (D. Utah May 14, 2009) (holding "that the Receiver has standing to assert fraudulent transfer and unjust enrichment claims against the alleged 'winners' of Southwick's Ponzi scheme" because "[t]he entities in receivership were injured when Southwick used them to commit fraud and waste" and "[o]nce Southwick was removed from the scene, those entities, now under the auspices of the Receiver, are entitled to seek the return of these fraudulently dissipated payments"); *Warfield v. Carnie*, No. 3:04-cv-633-R, 2007 WL 1112591, at *9 (N.D. Tex. Apr. 13, 2007) ("A receiver of an alleged Ponzi scheme may sue under the UFTA to recover funds paid from the entity in receivership." (citing *Scholes*, 56 F.3d at 750)); *In re Wiand*, No. 8:05-CV-1856-T-27MSS, 2007 WL 963165, at *2 (M.D. Fla. Mar. 27, 2007) ("Because the corporation was injured by the diversion of its assets, the receiver, standing in the shoes of the corporation, had standing to set aside the fraudulent transfers." (citing *Scholes*, 56 F.3d at 754)); *Quilling v. Cristell*, No. Civ. A. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 9, 2006) ("Under the clear and persuasive reasoning of the court in *Scholes*, the Receiver, as receiver for all entities owned or controlled by Gilliland, including the Gilliland Entities, properly has standing to bring the fraudulent transfer claims that he is asserting against Defendants."); *Obermaier v. Arnett*, No. 2:02CV111FTM29DNF, 2002 WL 31654535, at *4 (M.D. Fla. Nov. 20, 2002) ("The Receiver, as an equity receiver, clearly has standing to bring claims if the causes of action attempt to redress injuries to the Receivership Entities."); *see also Mays v. Lombard*, No. 3:97-CV-1010-X, 1998 WL 386159, at *2-3 (N.D. Tex. July 2, 1998).

began to run then and has now elapsed. Although this argument is couched in timeliness terms, it is really the same erroneous imputation-of-knowledge argument that the Seventh Circuit rejected in *Scholes*. Under *Scholes*'s teachings, the knowledge and effect of the Ponzi scheme principal's fraudulent transfers may not be attributed to his robotic corporate tools, or prevent a receiver from suing on behalf of those entities, once they have been freed from the principal's coercion, thus permitting the receiver to recover corporate assets that the principal fraudulently transferred to third parties. *See Scholes*, 56 F.3d at 753-55. In this respect, it makes no difference that Stanford and Davis made some of the political contributions in their own names because, as we describe in more detail later, they did so with the Stanford corporations' assets derived from the Ponzi scheme's sale of fraudulent CDs. *See id.* at 757-58.

The district court's error in misidentifying the basis for the Receiver's standing to bring this action, *viz.*, that he was bringing it on behalf of the Stanford corporations' investor-creditors instead of the corporate entities, is harmless and therefore does not justify reversal of the district court's judgment. The district court's order appointing the Receiver invests him with the full powers of an equity receiver under common law as well as certain enumerated powers, including the power to take and have complete control, possession, and custody of the receivership estate and over any assets traceable to assets owned by the estate; to collect, marshal, and take custody of all assets of the estate, wherever situated, and all sums of money owed to the estate; and to institute actions or proceedings to impose a constructive trust, obtain possession, and recover judgment with respect to persons or entities who received assets or records traceable to the receivership estate. The district court's order, however, does not authorize the Receiver to represent the creditors of the corporations in receivership in asserting claims against third persons. The Receiver's original complaint against the Committees alleges, gives notice of, and states a claim by

the Receiver on behalf of the Stanford corporations and does not raise a claim on behalf of the creditors of the estate. Specifically, the complaint alleges that Stanford, Davis, and the Stanford corporations contributed more than $1.8 million of the corporations' ill-gotten gains to the Committees. The complaint seeks a judgment that the payments from Stanford, Davis, and the Stanford corporations to the Committees constitute fraudulent transfers under applicable law; that the transferred funds are property of the receivership estate held pursuant to a constructive trust for the benefit of the estate; and that the Committees are liable to the receivership estate for an amount equaling the amount of funds transferred by Stanford, Davis, and the Stanford corporations to the Committees. Both sides are well aware of *Scholes* and the jurisprudence it has generated; they have cited it prominently in their briefs for propositions favorable to their respective litigation positions while disregarding aspects of *Scholes* that they each deem unfavorable to their causes. Consequently, we conclude that the error by the district court in misidentifying the basis for the Receiver's standing to bring this suit is not material and, moreover, has not prejudiced any party in its claims, arguments, or showings for or against the motions at issue in this appeal.

Because the presence of at least one petitioner with standing is sufficient to satisfy Article III's case-or-controversy requirement, the presence of that party, and its standing, makes it unnecessary to consider whether others do as well. *Horne v. Flores*, 557 U.S. 433, 445 (2009); *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 53 n. 2 (2006). Moreover, we may affirm a grant of summary judgment on any ground supported by the record, even if it is different from that relied upon by the district court. *See Salazar v. Dretke*, 419 F.3d 384, 394 (5th Cir. 2005); *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001); *Tex. Refrigeration Supply, Inc. v. FDIC*, 953 F.2d 975, 980 (5th Cir. 1992).

No. 11-10704

## III.  Discussion of Arguments on Appeal

The Committees present two principal arguments on appeal:  first, that the Receiver's TUFTA claim was untimely, and second that the claim is preempted by federal law.

### A.  Timeliness

The Committees argue that the Receiver's TUFTA claims are barred as untimely for several reasons.  First, the Committees argue that because the Stanford corporations had knowledge of the contributions when they were made between 2000 and 2009, TUFTA's four-year period for bringing a fraudulent-conveyance action, and the one-year period for filing suit after discovery of the fraudulent transfers, elapsed before the Receiver was appointed in 2009.  However, we have already rejected this argument in the foregoing section discussing standing and knowledge in Ponzi-scheme cases.  Because the Stanford corporations were the robotic tools of Stanford's Ponzi scheme, knowledge of the fraud could not be imputed to them while they were under Stanford's coercion.  Consequently, the Committees are not entitled to summary judgment or dismissal of this suit based on the theory that knowledge of the fraudulent transfers were imputed to the Stanford corporations so as to bar the Receiver from asserting their claims to set aside the fraudulent transfers to the Committees.

Second, the Committees assert that they are entitled to summary judgment because the Receiver either discovered or reasonably could have discovered the donations to the Committees more than a year before he filed suit because when the donations were made they were registered with a federal agency and reported in the public news media.  This argument is without merit.  Under TUFTA (and as discussed more fully below), a fraudulent-conveyance claim does not accrue until the claimant knew or reasonably could have known both of the transfer and that it was fraudulent in nature.  Further, a defendant

No. 11-10704

moving for summary judgment on the affirmative defense of limitations must prove that defense conclusively.  The Committees failed in this respect because they presented no evidence to show that the Receiver knew or could reasonably have known for more than one year prior to filing suit that the donations to the Committees were fraudulent conveyances that had been made during the operation of a Ponzi scheme and using funds from the Stanford corporations that were proceeds of that scheme.  On the other hand, the Receiver, in support of his motion for summary judgment, demonstrated beyond genuine dispute, with evidence discovered through reasonable diligence well after his appointment and less than one year prior to filing suit, that Stanford operated a Ponzi scheme during the time the donations were made to the Committees and that the contributions were made using funds from Stanford's captive corporations and derived from SIBL's sale of fraudulent CDs.  The Committees presented no evidence to controvert these facts or to show that the Receiver did not act with reasonable diligence and speed in discovering evidence to prove the existence of the Ponzi scheme and thereby prove that the donations to the Committees were fraudulent as a matter of law.  *See Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 793 F. Supp. 2d 825, 858 (N.D. Tex. 2011) ("The . . . Committees fail to create a fact issue concerning the Ponzi scheme's existence or the contributions' source and make no attempt to show that the contributions were made in exchange for consideration of reasonably equivalent value.").

Through TUFTA, Texas has incorporated the UFTA into its law.[6]  *See* TEX. BUS. & COM. CODE § 24.001 et seq.  Under TUFTA, a defrauded creditor may

---

[6] The Committees argue, and the Receiver agrees, that Texas state law, specifically TUFTA, the state's incorporation of UFTA, should apply in this case.  Because the parties agree that the law of Texas controls, relied on Texas law before this court and the district court, and failed to raise or brief the issue of choice of law, we need not address any choice-of-law question.  *See Nichols v. Anderson*, 837 F.2d 1372, 1377 n.1 (5th Cir. 1988); *N.K. Parrish, Inc. v. Sw. Beef Indus. Corp.*, 638 F.2d 1366, 1370 n.3 (5th Cir. 1981); *Smith v. N.Y. Life Ins. Co.*, 579 F.2d 1267, 1270 n.5 (5th Cir. 1978).

recover amounts transferred from a debtor if the creditor can prove that the debtor made a fraudulent transfer of assets[7] and that the transferee is not entitled to claim a statutory defense from liability.[8] To recover under the theory of actual fraud, the creditor must show that the debtor made a particular transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 24.005(a)(1). UFTA is modeled on § 548(a)(1) of the Bankruptcy Code, and, therefore, cases interpreting § 548(a)(1) may be used to interpret UFTA or its Texas equivalent. *See Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (reasoning that Washington's UFTA is "virtually identical" to 11 U.S.C. § 548 and concluding that cases interpreting § 548 are consistent with Washington law); *see also Janvey*, 793 F. Supp. 2d at 856 n. 52 ("There are no material differences between the Washington and Texas UFTA statutes." (citing *Byron*, 436 F.3d at 558)).

Under TUFTA, a fraudulent-transfer claim is "extinguished" if not brought "within four years after the transfer was made . . . or, if later, within one year after the transfer . . . was or could reasonably have been discovered by the claimant." TEX. BUS. & COM. CODE § 24.010(a)(1). With respect to the latter portion of the statute, the discovery rule, Texas courts of appeals have held that section 24.010(a)(1) requires that a fraudulent-transfer claim be filed within one year of when the *fraudulent nature* of the transfer was or reasonably could have been discovered. *See, e.g.*, *Duran v. Henderson*, 71 S.W.3d 833, 839 (Tex. App. 2002). In other words, "[when] all the elements of the cause of action for fraud are discovered or should have been discovered," the cause of action will accrue.

---

[7] A transfer may be actually fraudulent or constructively fraudulent as to the debtor's creditors. *See id.* § 24.005(a)(1) (actual fraud), (a)(2) (constructive fraud). Here, the Receiver alleges that the transfers made from the receivership entities were made with actual intent to defraud the creditors of those entities, *e.g.*, the investors. For that reason, we will not analyze whether the transfers were also constructively fraudulent as to those creditors.

[8] *See id.* § 24.009.

No. 11-10704

*See Freitag v. McGhie*, 947 P.2d 1186, 1190 (Wash. 1997) (interpreting Washington's UFTA); *accord Duran*, 71 S.W.3d at 839; *see also* TEX. BUS. & COM. CODE § 24.012 ("[TUFTA] shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of [TUFTA] *among states enacting it*.") (emphasis added). Therefore, under Texas appeals-courts decisions, the limitations period does not begin to run upon the discovery of *the transfer* alone. Instead, a claim under section 24.005(a)(1) of TUFTA has been held to accrue only when the claimant discovers or reasonably could have discovered the fraudulent nature of the conveyance. *See Duran*, 71 S.W.3d at 839. As the *Duran* court explained, "[t]he discovery rule provides that a claim for fraud does not accrue, and thus the limitation period does not begin to run, until *the fraud* is discovered, or in the exercise of reasonable diligence should have been discovered." *Id.* (emphasis added). Nor is this unique to TUFTA; rather, the majority of jurisdictions that have addressed the issue have similarly interpreted the same UFTA provision. For example, in *State Farm Mutual Automobile Insurance Co. v. Cordua*, the court surveyed cases interpreting UFTA's discovery rule—including *Duran v. Henderson*—and concluded that "the majority of other jurisdictions have consistently held that the one-year savings provision does not begin to accrue until the creditor discovers or could have reasonably discovered the nature of the fraudulent transfer." 834 F. Supp. 2d 301, 307 (E.D. Pa. 2011).[9]

---

[9] *See also In re Bushey*, 210 B.R. 95, 99 n. 5 (B.A.P. 6th Cir. 1997) (noting that "Ohio applies a discovery-of-the-fraud rule" to the state's UFTA); *Freitag*, 947 P.2d at 1190 (holding that UFTA's discovery rule provides a "one-year period from the date of discovery of the fraudulent nature of the transfer within which to initiate a claim under the UFTA"); *Duran*, 71 S.W.3d at 839 ("A creditor's cause of action to set aside a fraudulent conveyance accrues [and thus the limitations period does not begin to run until] the creditor acquires knowledge of the fraud, or would have acquired knowledge of the fraud in the exercise of ordinary care."); *Rappleye v. Rappleye*, 99 P.3d 348, 356 (Utah Ct. App. 2004) (holding that UFTA incorporates the discovery rule such that the limitations period is determined by the date on which the creditor was "on notice that the conveyance was *fraudulent*").

13

No. 11-10704

In light of the foregoing decisions by the Texas courts of appeals, and in view of the majority of authorities in other jurisdictions interpreting the UFTA discovery rule, we *Erie* guess that the Texas Supreme Court would conclude that section 24.010(a)(1) of TUFTA requires that a fraudulent-transfer claim must be filed within one year after the fraudulent nature of the transfer is discovered or reasonably could have been discovered.

Texas appeals courts have held that under TUFTA, "[a] defendant moving for summary judgment on the affirmative defense of limitations has the burden to establish that defense conclusively." *Johnston v. Crook*, 93 S.W.3d 263, 269 (Tex. App. 2002) (citing *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999)). "Thus, the defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of its injury." *Id.* (citing *KPMG Peat Marwick*, 988 S.W.2d at 748). "If the movant establishes that the statute of limitations bars the action, the non-movant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations." *Id.* (citing *KMPG Peat Marwick,* 988 S.W.2d at 748). "When a plaintiff knew or should have known of an injury is generally a question of fact." *Cadle Co. v. Wilson*, 136 S.W.3d 345, 352 (Tex. App. 2004). "However, if reasonable minds could not differ about the conclusion to be drawn from the facts in the record, then the start of the limitations period may be determined as a matter of law." *Id.*

On the other hand, a receiver bringing a TUFTA action is dramatically assisted by other legal principles if he can prove that the transfers in question were made by the principal of a Ponzi scheme. "This court has held that transfers from a Ponzi scheme are presumptively made with intent to defraud,

because a Ponzi scheme is, 'as a matter of law, insolvent from its inception.'" *Am. Cancer Soc. v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012) (quoting *Byron*, 436 F.3d at 558-59). Further, we have described a Ponzi scheme as "a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments." *Id.* (quoting *Alguire II*, 647 F.3d at 597) (internal quotation marks omitted).

In the present case, applying the foregoing principles, we conclude that the Committees have failed to carry their burden of demonstrating conclusively that the Receiver did not timely file this TUFTA action because they have failed to show that the Receiver knew or reasonably could have discovered that the donations to the Committees were fraudulent in nature more than one year before he filed this suit.[10] The evidence reflects that upon the Receiver's appointment on February 16, 2009, it was not readily evident to him or to anyone not privy to the inner workings of the Stanford corporations that these entities were part of a massive Ponzi scheme perpetrated by Stanford beginning as early as 1999. Accordingly, the Receiver, immediately upon his appointment, took possession of the books and records of the Stanford corporations, retained Van Tassel, a certified public accountant, and her firm, FTI Consulting, Inc., and requested that they analyze the corporations' books and records, discover evidence from other sources, and determine whether Stanford and his corporations had engaged in such a Ponzi scheme and, if so, to trace the assets

---

[10] The crucial issue is when the Receiver knew or could reasonably have known of the fraudulent nature of the transfers, not simply when he knew or could reasonably have known that the transfers had been made. Thus, the Committees' argument, *viz.*, that the Receiver knew of the transfers upon his appointment on February 16, 2009 because information of their existence was available online, via the FEC, and in the news media, is beside the point. Even if we assume that to be true, the Committees still did not demonstrate conclusively that the Receiver knew or could reasonably have known of the *fraudulent nature of the transfers* for more than one year before he filed this suit.

of the corporations that had been diverted and dissipated in the operation of the scheme. In her December 17, 2010 and March 11, 2011 declarations, Van Tassel concluded that Stanford and his corporations were operating as a Ponzi scheme from at least 1999 forward; SIBL was insolvent from at least 1999 forward; the Committees received funds from Stanford, Davis, and Stanford's corporations between February 17, 2000 and May 21, 2008; and Stanford's reported income from at least 1999 forward was composed almost exclusively of income derived from the Stanford entities, including proceeds from SIBL's sale of fraudulent CDs.

The record does not reflect that the Receiver had any feasible means to discover whether the donations to the Committees were fraudulent in nature other than to have an expert examine the books and records of Stanford, SIBL, and the Stanford corporations to determine whether the receivership entities had been part of a Ponzi scheme so that the donations of their funds to the Committees would be presumed, as a matter of law, to have been fraudulent. Furthermore, the Committees have not described or presented evidence of any other feasible course the Receiver could have taken. Persons within the SEC suspected Stanford and his corporations of operating a Ponzi scheme of the kind Van Tassel found and described. But without an expert's examination of the corporations' books and records, no outsider, including the SEC, could have known or discovered probative evidence that Stanford had operated a Ponzi scheme from at least 1999 forward or that the funds behind the contributions to the Committees had come from corporations that Stanford coerced and used in his scheme.

The record does not reflect exactly when the Receiver or Van Tassel knew or could reasonably have known that Stanford had operated a Ponzi scheme as early as 1999 or that funds from his corporate tools were used to make the donations to the Committees. But a careful examination of the evidence in

support of, and in opposition to, the motions for summary judgment reflects that neither the Receiver nor his expert reasonably could have known or discovered probative evidence of the Ponzi scheme more than one year prior to the Receiver's filing of this suit on February 19, 2010. Remember, the SEC filed its suit against Stanford, his corporations, and his associates on February 16, 2009, and that same day the district court restrained Stanford, et al., from disposing of assets, books, or records of the corporations, assumed exclusive jurisdiction and possession of the same, appointed Janvey the Receiver over the receivership's assets and spelled out his authority and duties, including taking possession of all receivership assets, books, and records, and tracing the dissipated or diverted assets of the receivership entities.[11] On the same day, the Receiver retained Van Tassel to analyze the books and records of the Stanford corporations and determine the financial status and condition of Stanford and his entities. According to the SEC's complaint, Stanford and Davis, the only individuals who knew of the true nature of Stanford's operations and the whereabouts of the vast majority of the SIBL's supposedly multi-billion-dollar investment portfolio, had refused to appear and give testimony in the SEC's investigation. It was not until August 27, 2009 that Davis pleaded guilty to federal securities-, mail-, and wire-fraud offenses and in connection therewith disclosed facts indicating the true nature and duration of Stanford's operation of a massive Ponzi scheme. The Receiver filed this suit on February 19, 2010, less than one year after Davis's guilty plea. There is no evidence in the record to indicate that the Receiver or Van Tassel had developed or could reasonably have developed knowledge or probative evidence of the true nature and duration of the Ponzi scheme prior to Davis's guilty plea on August 27, 2009. To be

---

[11] Both the SEC's suit and the order appointing the Receiver are dated February 16, 2009. However, the former is stamped as filed on February 17, 2009. Nonetheless, this detail does not compel different conclusions from those we reach.

specific, the Committees have not introduced any evidence that tends to show that the Receiver knew or could reasonably have known about the true nature and duration of the Ponzi scheme for more than one year prior to the Receiver's filing of this suit on February 19, 2010 or that the Receiver and Van Tassel did not search diligently to uncover evidence and knowledge of the Ponzi scheme and its link to the donations made to the Committees. Therefore, the district court's denial of the Committees' motions for dismissal and summary judgment will be affirmed.

Turning to the *Receiver*'s motion for summary judgment, we conclude that the evidence presented to the district court overwhelmingly established that, from at least as early as 1999, the Stanford corporations were nothing more than robotic tools of Stanford's elaborate Ponzi scheme and that the funds used to make the donations to the Committees were taken by Stanford and Davis, directly or indirectly, out of the Stanford corporations' proceeds from the sales of the fraudulent CDs.

On August 27, 2009, Davis was rearraigned and pleaded guilty to a number of offenses, the basic elements of which were that he knowingly defrauded investors who purchased CDs from SIBL and that he also conspired to obstruct an SEC investigation into SIBL. Davis agreed to the following factual basis for his guilty plea: from at least 1999 through February 2009, Davis, along with Stanford and others, orchestrated a scheme whereby investors were duped into investing more than $5 billion into a CD program at SIBL, located in Antigua, which Davis and Stanford had advertised would be reinvested in safe and secure investments but which were in fact used to perpetrate a massive Ponzi scheme. Further, as early as 1990, Davis as controller and then as CFO of SIBL, at Stanford's request, began making false entries into the books and records of SIBL, reflecting false earnings and assets that were shown on SIBL's annual reports filed with the Antigua bank

regulators. SIBL's base of operations was in Houston, Texas, along with its parent company, Stanford Financial Group. And from the offices of these entities, false financial disclosures were manufactured and mailed to investors, and over $2 billion in loans to Stanford were not disclosed to them. Also, real estate owned by SIBL was listed as being worth billions of dollars when in fact it was worth no more than $100 million. Finally, undisclosed to investors were the facts that Stanford paid the Antigua bank regulators hundreds of thousands of dollars in bribes to not examine SIBL's books and that he paid an ostensibly independent Antiguan auditing firm more than hundreds of thousands of dollars in bribes to dishonestly audit SIBL's financial condition.

Through forensic accounting of the business records of the corporations and other records obtained from third parties and financial institutions, Van Tassel discovered that the Stanford corporations did not make investments from the proceeds of the sale of CDs in high-quality securities as promised to investors. Instead, the returns and redemptions on the investors' CDs were wholly funded by new principal investments into the Stanford corporations. Ultimately, in her two declarations included in the Receiver's motion for summary judgment and by evaluating the actual assets of the Stanford corporations over a nine-year period reaching back to December 31, 1999, Van Tassel concluded that the Stanford companies were insolvent entities used by Stanford in a Ponzi scheme from at least 1999 because the corporations were funded and sustained primarily by proceeds from SIBL's sale of the fraudulent CDs. Yet SIBL's assets consisted chiefly of "financial assets" whose fair market value was much smaller than reported and of Stanford's worthless promissory notes. Thus, SIBL's liabilities (from the sale of CDs) exceeded its actual assets, rendering the company insolvent and creating burgeoning deficits year-on-year since at least 1999. Moreover, the monies Stanford and Davis contributed to the Committees could not have come from any source other than the Ponzi scheme.

No. 11-10704

Van Tassel concluded that over 99% of Stanford's reported income was generated from the scheme, and, based on Davis's plea agreement in his criminal case, Davis agreed to forfeit all his interest in the $1 billion he acknowledged that he had derived from the Ponzi scheme.

Considering all of the summary-judgment evidence that the Receiver presented to the district court, including Van Tassel's declarations and supporting documents, Davis's guilty plea and rearraignment statements, and the lack of any cogent countervailing summary-judgment evidence introduced by the Committees, we conclude that there is no genuine issue as to any material fact and that the Receiver is entitled to a judgment as a matter of law.

Finally, and related to their argument regarding to the discovery rule, the Committees assert that the district court abused its discretion in denying their discovery request (a motion to compel) and that they were prejudiced as a result. Specifically, the Committees requested that the Receiver be compelled to produce correspondence relating to, and several drafts of, documents that he had issued regarding the contributions made to the Committees. The Committees claim that the documents may contain metadata indicating that they were created before February 19, 2009. The Receiver refused on multiple grounds, but a common thread was that the requested documents and correspondence were protected by attorney-client privilege and work-product doctrine. However, the Receiver provided the Committees with a log of the documents that were withheld, and the district court reviewed the documents *in camera* and determined that they did not fall under the exception to the privilege and the doctrine outlined in *Conkling v. Turner*, 883 F.2d 431 (5th Cir. 1989).[12]

---

[12] In *Conkling*, the plaintiff claimed that a statute of limitations should be equitably tolled because he did not know that a defendant's statement was false until his (the plaintiff's) attorney informed him of such. *Id.* at 434. Because the plaintiff "injected into [the] litigation the issue of when he knew or should have known of the falsity of [the defendant's] assertion," we permitted the defendants to conduct a limited deposition of the plaintiff's attorney. *Id.*

No. 11-10704

On appeal, the Committees do not dispute that the documents are privileged. Rather, the Committees contend that the *Conkling* exception applies because the materials sought will help determine when the Receiver discovered, or reasonably could have discovered, the *contributions* made to the Committees. However, as previously discussed, the ultimate question is when the Receiver knew or could reasonably have known about the *fraudulent nature* of the contributions, not just their existence. Thus, the district court would have been obliged to find the *Conkling* exception inapplicable if none of the sealed documents tended to show that the Receiver, prior to the crucial date, not only knew that the contributions had been made but also that they had been made with fraudulent intent.

Even if we assume, for the sake of argument, that the district court erred in not applying the *Conkling* exception, the Committees have failed to preserve this issue for appeal by failing to provide any meaningful way to review the disputed documents. Had the Committees wished to pursue this argument, they should have moved to have the documents, along with any metadata, made available for review. *See, e.g.*, *Miss. Pub. Employees' Retirement Sys. v. Boston Scientific Corp.*, 649 F.3d 5, 30 n.22 (1st Cir. 2011). The district court examined the documents, determined that it was not necessary to look at the metadata they may have contained, and concluded that they did not fit the criteria for the *Conkling* exception to apply. Absent a meaningful way to review the disputed documents, it is not possible to examine whether the district court abused its discretion by denying the Committees' discovery request as to the documents.

Furthermore, insofar as the Committees suggest that the district court's *in camera* review of the hardcopy documents was inadequate because it did not include the metadata itself, their argument is waived because they did not raise it until their reply brief. *E.g.*, *Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 702 (5th Cir. 2010). Consequently, we cannot say

that the district court abused its discretion in denying the Committees' discovery request.

## B.  Preemption

The Committees' fourth argument is that federal campaign finance law preempts the Receiver's TUFTA claims.  "Preemption can take multiple forms: Congress can expressly preempt state law in federal statutory language, or it can impliedly preempt state law." *Castro v. Collecto, Inc.*, 634 F.3d 779, 785 (5th Cir. 2011).  Implied preemption may take two forms: field preemption and conflict preemption.  *Id.*  Field preemption applies "where federal law 'is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation,' or 'the federal interest [in the field] is so dominant' that it 'preclude[s] enforcement of state laws on the same subject.'" *Id.* (quoting *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)) (citations omitted).  Conflict preemption applies "(1) where complying with both federal law and state law is impossible; or (2) where the state law 'creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 563-64 (2009) (internal quotation marks omitted)).  Reviewing each form of preemption, we conclude that none applies and that, therefore, the Receiver's TUFTA claim is not preempted.

### 1.

The Committees argue that FECA expressly preempts the Receiver's TUFTA claim because it preempts "any provision of State law with respect to election to federal office."  2 U.S.C. § 453.  We disagree.

TUFTA is a general state law that happens to apply to federal political committees in the instant case.  In cases like this one, we have rejected express preemption arguments and construed § 453 narrowly.  For instance, in *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273 (5th Cir. 1994), we rejected a federal

candidate's argument that FECA preempted a company's state law cause of action against him for the debts of his campaign committee:

> Although Thornburgh attempts to stretch § 453 far enough to create a preemptive bar to applying state law to hold federal candidates personally liable, we cannot read FECA as extending that far.  First, a "strong presumption" exists against preemption, and "courts have given section 453 a narrow preemptive effect in light of its legislative history."  In addition, nowhere in the text of FECA or accompanying regulations is the personal liability of a candidate addressed. Finally, the Federal Election Commission ("FEC") has opined that state law supplies the answer to the question who may be held liable for campaign committee debts. Accordingly, in light of the FEC's view, the strong presumption against preemption, the historically narrow reading of § 453, and FECA's silence on the issue of candidate liability, we conclude that Thornburgh's argument for express preemption must fail.

*Id.* at 1280 (footnotes and citations omitted); *see also Stern v. Gen. Electric Co.*, 924 F.2d 410 (2d Cir. 1991) (holding that § 453 does not preempt a state law establishing a company's directors' fiduciary duty to shareholders, including not wasting corporate assets, and explaining that "the narrow wording of [§ 453] suggests that Congress did not intend to preempt state regulation with respect to non-election-related activities"); *Reeder v. Kans. City Bd of Police Comm'ers*, 733 F.2d 543 (8th Cir. 1984) (holding that § 453 did not preempt a state law prohibiting officers or employees of the Kansas City Police Department from making any political contribution); *Friends of Phil Gramm v. Ams for Phil Gramm in '84*, 587 F. Supp. 769 (E.D. Va. 1984) (holding that § 453 did not preempt a state law prohibiting unauthorized use of a person's name for advertising or commercial purposes).

The cases that the Committees cite are all inapposite because they pertain to state laws that specifically regulated federal campaign finance in contravention of FECA's preemption provision.  *See Teper v. Miller*, 82 F.3d 989 (11th Cir. 1996) (state law effectively prohibiting Georgia legislators from

accepting donations for a federal campaign while the state General Assembly was in session); *Bunning v. Ky.*, 42 F.3d 1008 (6th Cir. 1994) (state law authorizing investigation of campaign expenditures of a federal political committee); *Weber v. Heaney*, 995 F.2d 872 (8th Cir. 1993) (state law establishing system under which federal congressional candidates could agree to limit their federal expenditures in exchange for state funding for their campaigns).

Nor does TUFTA implicate the core concerns of FECA. As the Receiver correctly explains, he does not seek a refund of the contributions. Rather, TUFTA entitles Janvey to "recover judgment for the value of the asset[s] transferred[] . . . or the amount necessary to satisfy the creditor's claim, whichever is less." TEX. BUS. & COM. CODE § 24.009(b).

2.

The Committees next argue that field preemption applies. However, because Congress has not occupied the field with regard to claims like those brought under TUFTA and because courts have consistently indicated that FECA's preemptive scope is narrow in light of its legislative history, *see, e.g., Karl Rove*, 39 F.3d at 1281; *Stern*, 924 F.2d at 475 n.3; *Weber*, 995 F.2d at 876, we conclude that field preemption does not apply.

First, the Committees contend that § 441a-k of FECA states a "comprehensive list" of illegal sources for campaign contributions[13] and that TUFTA impermissibly designates another source of "illegal" contributions. This, the Committees argue, is consistent with "[t]he primary purpose of FECA, [which] . . . is to regulate campaign contributions and expenditures in order to

---

[13] These provisions establish: limitations on the amount that may be given, § 441a; restrictions on who may give, § 441b-f; limitations on the contribution of currency, § 441g; regulation of soft money, § 441i; and a prohibition on fraudulent misrepresentation of campaign authority, § 441h.

24

eliminate pernicious influence—actual or perceived—over candidates by those who contribute large sums." *Karl Rove*, 39 F.3d at 1281. But, as the Receiver correctly observes, this appeal pertains to an impermissible source of funds for the contributor (the Stanford, Davis, and the Stanford corporations), not the Committees, and § 441a-k only pertains to the latter. Moreover, as the district court noted, neither Congress nor the FEC "has ever attempted to graft any of these potential uses of erstwhile campaign contributions onto the purportedly exclusive list of prohibited limitations on contributions and expenditures." Finally, the Committees' argument would lead to absurd results: under their interpretation, they would be allowed to keep funds that were, for example, stolen by force or fraud so long as the contributions did not run afoul of § 441a-k.

Second, the FEC, in advisory opinions cited by the district court, has ruled that candidates and political committees remain subject to state contract law. FEC Adv. Op. 1989-02 at 2 (Apr. 25, 1989); FEC Adv. Op. 1975-102 at 1 (Jan. 29, 1976). This suggests that Congress had no intention to "occupy the field" with regard to campaign finance such that state fraudulent transfer laws would be preempted. Given this, field preemption does not apply.

3.

Finally, we conclude that conflict preemption does not apply here. First, the Committees argue that because FECA does not designate fraudulent transfers as illegal, TUFTA must conflict with FECA. This is a rehashing of the Committee's argument regarding field preemption—namely, that because § 441a-k of FECA states a "comprehensive list" of illegal sources for campaign contributions, TUFTA impermissibly designates another source of "illegal" contributions by allowing the Receiver's claims—which we have already rejected. Accordingly, for the same reason that field preemption does not apply on this basis, neither does conflict preemption.

Second, the Committees maintain that the Receiver's TUFTA claims conflict with the BCRA's soft money provisions. They submit that because the BCRA requires them to dispose of all soft money, they may not be compelled, under state law, to return that money. We find this argument unpersuasive. It depends on characterizing the Receiver's TUFTA claim as a refund, which as previously discussed is inaccurate. The Receiver does not seek recovery of the exact soft-money funds that the Committees assert have now been spent. *See* TEX. BUS. & COM. CODE § 24.009(b) ("[T]he creditor may recover judgment for the value of the asset transferred[] . . . or the amount necessary to satisfy the creditor's claim, whichever is less."). Nor does the fact that the original funds have been spent preclude the Receiver from asserting his claim. *See, e.g.*, *Donell*, 533 F.3d at 776 & n.9 (noting, in a fraudulent transfer case, that claims may often arise "years after the money has been received and spent" by the recipient but explaining that such claims are nonetheless permitted). Accordingly, conflict preemption does not apply.

## CONCLUSION

For these reasons, we AFFIRM the district court's judgment.

26