PATRICK E. HIGGINBOTHAM, Circuit Judge,
concurring:
I concur in the majority opinion but write separately to state what is, to these eyes, a more fundamental reason that the arbitration clauses in this case are not enforceable. Simply put, arbitration agreements may be rejected when they are instruments of a criminal enterprise, as these arbitration agreements were. The Federal Arbitration Act (“FAA”) evinces Congress’s desire to enforce arbitration agreements,[1] an expression warmly embraced by the judiciary. But, there are limits. Those limits here control.
I write against an informing backdrop of a decision of the Court of Exchequer nearly 300 years ago. In the 1725 case of Everet v. Williams, also known as the Highwayman’s Case,[2] highwaymen Everet and Williams entered into a partnership to share robbery proceeds. They took their dispute over the proper division of their booty to court, filing a Bill in Equity at the Court of Exchequer. The court considered the Bill to be “scandalous and impertinent.”[3] Both Everet and Williams were arrested and hanged. Counsel were punished with costs and one was sentenced to hang, but was ultimately banished.[4] The present case concerns the proper division of illegally procured booty from victims of a criminal enterprise — over $200 million, payable but frozen in accounts of sales persons of the enterprise, some having earned in excess of $2 million for their role in the scheme. In short, we have in judicial control over $200 million in booty, undisputed to be proceeds from the criminal scheme.
This case is only one of many attempting to sift the ruins of Allen Stanford’s massive Ponzi scheme,[5] a simply constructed vintage fraud. “[A] Ponzi scheme is one where the ‘swindler uses money from later victims to pay earlier victims.’ ”[6] Its name derives from Charles Ponzi, whose fraud the Supreme Court described almost a century ago:
In December, 1919, with a capital of $150, [Charles Ponzi] began the business of borrowing money on his promissory notes. He did not profess to receive money for investment for account of the lender. He borrowed the money on his credit only. He spread the false tale that on his own account he was engaged in buying international postal coupons in *247 foreign countries and selling them in other countries at 100 per cent, profit, and that this was made possible by the excessive differences in the rates of exchange following the war. He was willing, he said, to give others the opportunity to share with him this profit. By a written promise in 90 days to pay them $150 for every $100 loaned, he induced thousands to lend him ... Within eight months he took in $9,582,000, for which he issued his notes for $14,374,000. He paid his agents a commission of 10 per cent. With the 50 per cent, promised to lenders, every loan paid' in full with the profit would cost him 60 per cent. He was always insolvent, and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.[7]
At its core, a Ponzi scheme must have in its operation the ability to lull an investor by assuring payments from money of later investors, as there are few if any funds being generated by management of their investments. Its essence is to present an air of legitimacy, while simultaneously masking the source of the “return on investment,” a reality that must not be exposed — to borrow from Gertrude Stein, that “there is no there there.”[8] To this end, arbitration is a valuable tool. Arbitration helps ensure that the occasional dispute with an investor or employee remains private.
Arbitration as we presently know it was built on a bedrock interest of autonomy and its correlative, privacy. That interest has persisted.[9] The Supreme Court has accepted privacy as an expectation, if not an essential, of arbitration,[10] as has this Court.[11] In Stolt-Nielsen S.A v. Animal-Feeds International Corporation, for example, the Supreme Court considered “whether imposing class arbitration on parties whose arbitration clauses are ‘silent’ on that issue is consistent with the [FAA].” [12] In finding that class arbitration in such instances was inconsistent with the FAA,[13] Justice Alito described some “fundamental changes” between bilateral and class-action arbitration.[14] Notably, citing the Amicus Brief for the American Arbitration Association, Justice Alito explained, “[u]nder the Class Rules, ‘the presumption of privacy and confidentiality’ that applies in many bilateral arbitrations ‘shall not apply in class arbitrations,’ thus potentially frustrating the parties’ assumptions when they agreed to arbitrate.”[15] One year later in AT&T Mobility, Justice Scalia echoed the observation of arbitration’s confidential nature. In concluding that class arbitration was inconsistent with the FAA, Justice Scalia pointed out differences between bi *248 lateral arbitration and class-action arbitration.[16] For one, “[cjonfidentiality becomes more difficult.”[17] Such sentiments not only acknowledge confidentiality as a bargained-for virtue of arbitration, but also bring a judicial view that it is to be protected.
One thus understands why the operator of a Ponzi scheme would be attracted to arbitration. A single lawsuit — even one unrelated to the scheme — may, by the discovery process of a state or federal court, expose the source of an “investor’s return” — the fraud. Swindlers can use arbitration to mitigate discovery and cabin attending risk of exposing fraudulent activity while presenting arbitration, not as a tool of fraud, but as business as usual. In short, arbitration can assume a not insignificant role in protecting defendants’ privacy,[18] as we will see it did here.
“Stanford created and owned a network of entities ... that sold certificates of deposit (“CDs”) to investors through the Stanford International Bank, Ltd.”[19] “When the scheme collapsed in early 2009, the Stanford entities had raised over $7 billion from sales of fraudulent CDs.”[20] At the SEC’s request, the court appointed Ralph Janvey “as receiver over Stanford, his associates, his corporations, and their assets.”[21] The Receiver, standing in the shoes of the Stanford entities,[22] sued the employees, e.g., brokers, of the various Stanford entities to recover assets like salaries and bonuses earned from the scheme. Those employee-defendants object, claiming that the Receiver is required to arbitrate. Simply stated, the employee-defendants, Appellants here, had contracts containing arbitration clauses with Stanford entities. The employee-defendants argue that, since the Receiver stands in the shoes of the Stanford entities, he is bound to arbitrate as per their contracts with those entities. The Receiver disagrees, mounting a variety of attacks, including that “[t]he agreements were part of the fraud and coerced by the principals,” and “[hjolding that the Entities remain bound to these agreements when represented by the Receiver is illogical and fundamentally at odds with the holding of DSCC II.” -I agree.
The general principles of arbitration are easily stated, more so than applied. That an arbitration clause be treated as a contract distinct from the contract in which it appears is essential to forcing resolution of. a dispute to arbitration.[23] Said differently, arbitration clauses are severable from the contracts they are contained within, and any resistance to arbitration must target the arbitration clause itself.[24] As the Court *249 embraced arbitration, Prima Paint followed as night from day, holding that a claim of fraud in the inducement and fraud on the contract do not vitiate the independent arbitration clause.[25] Indeed, mine-run assertions of fraud and failed performance of contractual promises will seldom touch the arbitration clause, and the full case will proceed to arbitration. But Prima Paint also drew a line: although “claims of fraud in the inducement of the contract generally” must be arbitrated, claims of “fraud in the inducement of the arbitration clause itself’ may be litigated.[26] In my opinion, the latter category encompasses an arbitration agreement used as an instrument of a criminal enterprise.
While the Supreme Court continues to staunchly enforce arbitration to resolve disputes arising from contracts with arbitration clauses, it has not faded the Prima Paint boundary. The Supreme Court has long enforced agreements to arbitrate statutory claims,[27] including claims under § 10(b) of the Securities Exchange Act of 1934 and claims under the Racketeer Influenced and Corrupt Organizations Act (RICO).[28] And, citing § 2 of the FAA,[29] it has reaffirmed that the FAA’s “saving clause permits agreements to arbitrate to be invalidated by ‘generally applicable contract defenses, such as fraud, duress, or unconscionability,’ ” but, it has noted, “not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.” [30] In American Express Co. v. Italian Colors Restaurant,[31] the Supreme Court enforced a waiver of class arbitration against merchants suing American Express for a Sherman Act violation,[32] even though the cost of proving such a claim would far exceed the potential recov *250 ery for any individual plaintiff.[33] The Court found that “[n]o contrary congressional command,” — the antitrust laws or Rule 23 — required it “to reject the waiver of class arbitration.”[34] It also considered and rejected the “effective vindication” exception to the FAA.[35] “[T]he exception finds its origin in the desire to prevent ‘prospective waiver of a party’s right to pursue statutory remedies,’ ”[36] the Court reasoned, “[b]ut the fact that it is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the right to pursue that remedy.”[37] These cases demonstrate the Court’s firm defense of arbitration, but do not suggest that when arbitration has been used as an instrument in fraud itself, arbitration should nevertheless be enforced.[38]
I am persuaded that the Receiver— standing in the shoes of the Stanford entities — is not bound by the arbitration agreements because those agreements were instruments of Stanford’s fraud. Stanford and his co-conspirators exercised complete control over the receivership entities before the scheme collapsed,[39] and that control included the agreements to arbitrate, which were part of the contracts that had to be signed by the entities.[40] The arbitration agreements were central to the Stanford Ponzi scheme with its inherent need for privacy. As part of their employment contracts, the brokers fed the enterprise by the ongoing sale of CDs, for which they were handsomely compensated. Perversely, some employee-defendants claim they were deceived by the Ponzi scheme, yet the privacy of arbitration helped keep it hidden. The arbitration clauses, including their ostensible compliance with FIN-RA rules, perpetuated the Ponzi scheme by shielding the fraudulent activity from potentially revealing discovery while giving the scheme an air of legitimacy.[41] It signi- *251 fíes that a Ponzi scheme is extrinsic to the enforcement of promises of contracts that only in aggregation become illegal. This case does not present single inducement claims upon distinct contracts, rather it presents the claims of many swept into the vortex of a criminal enterprise collectively providing its fuel of new investors.
One lesson of the Highwayman’s Case is that efforts to enforce contracts in service of criminal enterprise ought receive a cold reception in the courts. Surely we would not enforce an arbitration clause in the agreement between Everet and Williams. Their autonomous right to dial out of the sovereign’s courts to frustrate its criminal law ought be no more enforceable than the court’s direct enforcement of their agreements to share the booty — at the least when its felonious nature has been established by conviction of the architect of the criminal scheme.
It is oft-repeated that “[t]he FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements.” [42] Since then, dispelling any notion of lingering hostility, courts have steadily increased their defense of arbitration, posing the question of its limits. I offer no new limit and break no new legal ground. There are outer boundaries to the enforcement of arbitration agreements, and they surely hit shoal water as they encounter the criminal enterprise, the existence of which here has been judicially determined and for which its principals have been convicted and sent to prison.[43]
Privacy remains a significant attractant to arbitration even as the cost of arbitration approaches that of litigation. In a Ponzi scheme, covering the eyes and ears of lulled investors by using arbitration, with its obstruction of the powerful discovery process of federal courts, mitigates the risks of a torch in a hay barn where a hot ember can take it down. It is no accident that even promissory notes with the sales personnel contained arbitration provisions. Here, the risk of discovery is so high as to pull the arbitration clause to the heart of the criminal enterprise and from the bite of Prima Paint. This is not to gainsay the strong support of arbitration by the Congress and the courts. Rather, refusing to enforce arbitration provisions deployed in service of an illegal scheme travels with and reinforces this foundational support— a friend, not an enemy, of arbitration.

. See Am. Express Co. v. Italian Colors Rest., -U.S. -, 133 S.Ct. 2304, 2308-09, 186 L.Ed.2d 417 (2013); AT & T Mobility LLC v. Concepcion, 563 U.S. 333, 344-46, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011).

. 9 L.Q. Rev. 197 (1893).

. U.S. S.E.C. v. Lyttle, 538 F.3d 601, 605 (7th Cir. 2008).

. See id.; Thomas v. UBS AG, 706 F.3d 846, 851 (7th Cir. 2013).

. See United States v. Stanford, 805 F.3d 557, 564 (5th Cir. 2015), cert. denied, — U.S.-, 137 S.Ct. 491, 196 L.Ed.2d 402 (2016); Zelaya v. United States, 781 F.3d 1315, 1318 (11th Cir. 2015) (describing Stanford's scheme as "one of the largest Ponzi schemes in American history”).

. Stanford, 805 F.3d at 564 n.1 (quoting United States v. Murray, 648 F.3d 251, 256 (5th Cir. 2011)).

. Cunningham v. Brown, 265 U.S. 1, 7-8, 44 S.Ct. 424, 68 L.Ed. 873 (1924). Ponzi was apparently not the first to come up with such a scheme. See Charles Dickens, The Life and Adventures of Martin Chuzzlewit (1844).

. Everybody’s Autobiography (1937).

. See Judith Resnik, Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights, 124 Yale L.J. 2804, 2894-95 (2015).

. See AT & T Mobility, 563 U.S. at 348, 131 S.Ct. 1740.

.Iberia Credit Bureau, Inc. v. Cingular Wireless LLC, 379 F.3d 159, 175 (5th Cir. 2004) ("[T]he plaintiffs’ attack on the confidentiality provision is, in part, an attack on the character of arbitration itself.”).

. 559 U.S. 662, 666, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010).

. See id. at 684, 130 S.Ct. 1758.

. Id. at 686, 130 S.Ct. 1758.

.Id. (citation omitted).

. AT & T Mobility, 563 U.S. at 347-48, 131 S.Ct. 1740.

. Id. at 348, 131 S.Ct. 1740.

. See generally Resnik, supra note 9, at 2894-96 (discussing real and perceived privacy in arbitration).

. Janvey v. Brown, 767 F.3d 430, 433 (5th Cir. 2014) (citation omitted).

. Id. (citation omitted).

. Janvey v. Democratic Senatorial Campaign Comm., Inc., 712 F.3d 185, 189 (5th Cir. 2013) [hereinafter DSCC II].

. Janvey v. Alguire, 539 Fed.Appx. 478, 480 (5th Cir. 2013) (unpublished).

. Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of-the contract.”).

. Id. at 445-46, 126 S.Ct. 1204; Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 71, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010).

. See Prima Paint Corp., 388 U.S. at 404, 87 S.Ct. 1801.

. Id. at 403-04, 87 S.Ct. 1801; accord Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 627, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (“[Cjourts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds ‘for the revocation of any contract.' " (citations omitted)).

. See Mitsubishi Motors Corp., 473 U.S. at 626-27, 105 S.Ct. 3346.

. Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 222, 238, 242, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987).

. AT & T Mobility, 563 U.S. at 339, 131 S.Ct. 1740 (“ ‘A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.’ " (quoting 9 U.S.C. § 2)).

. Id. at 339-40, 131 S.Ct. 1740 (citations omitted). That arbitration agreements are instruments of a fraudulent scheme is not an arbitration-specific defense. Any contract employed as an instrument of a fraudulent scheme would similarly be invalid. In any event, the cases cited by the Court evidence its concern for state laws targeting arbitration clauses. E.g., Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 683, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (holding “that Montana's first-page notice requirement, which governs not 'any contract,’ but specifically and solely contracts 'subject to arbitration,’ conflicts with the FAA and is therefore displaced by the federal measure.”).

. — U.S.-, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013).

. Id. at 2308 (“According to respondents, American Express used its monopoly power in the market for charge cards to force merchants to accept credit cards at rates approximately 30% higher than the fees for competing credit cards. This tying arrangement, respondents said, violated § 1 of the Sherman Act.” (footnote omitted)).

. Id. at 2316 (Kagan, J., dissenting) ("Italian Colors could take home up to $38,549. But a problem looms. As this case comes to us, the evidence shows that Italian Colors cannot prevail in arbitration without an economic analysis defining the relevant markets, establishing Amex's monopoly power, showing anticompetitive effects, and measuring damages. And that expert report would cost between several hundred thousand and one million dollars.” (footnote omitted)).

. Id. at 2309 (majority opinion).

. Id. at 2310 ("The ‘effective vindication’ exception to which respondents allude originated as dictum in Mitsubishi Motors, where we expressed a willingness to invalidate, on 'public policy’ grounds, arbitration agreements that 'operat[e] ... as a prospective waiver of a party’s right to pursue statutory remedies.’ ” (citation omitted)).

. Id. (citation omitted).

. Id. at 2311 (citation omitted).

. Id. at 2312 (2013) (Thomas, J., concurring) ("[T]he FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the formation of the arbitration agreement, such as by proving fraud or duress.” (citation and quotation marks omitted)).

. See Brown, 767 F.3d at 437-39; DSCC II, 712 F.3d at 193 ("Because the Stanford corporations were the robotic tools of Stanford's Ponzi scheme, knowledge of the fraud could not be imputed to them while they were under Stanford’s coercion”’); id. at 198 (concluding "that the evidence presented to the district court overwhelmingly established that, from at least as early as 1999, the Stanford corporations were nothing more than robotic tools of Stanford’s elaborate Ponzi scheme").

. Because this Court has embraced the principles in Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995), see Brown, 767 F.3d at 437; DSCC II, 712 F.3d at 190-92, the receivership entities are not responsible for actions directed by Allen Stanford to perpetuate the fraudulent Ponzi scheme.

. Granted, there are exceptions to the general privacy afforded in arbitration. See Resnik, supra note 9, at 2896-97. For instance, FIN- *251 RA rules require arbitration awards to be publicly available. FINRA Rules 12904(h), 13904(h). Nevertheless, the basic disputes remain concealed.

. AT & T Mobility, 563 U.S. at 339, 131 S.Ct. 1740; accord Am. Express Co., 133 S.Ct. at 2308-09.

. Stanford, 805 F.3d at 563; DSCC II, 712 F.3d at 189.